215 N.J. Super. 9 (1987)
520 A.2d 1154
FREDERICK BAINHAUER, PLAINTIFF-RESPONDENT,
v.
HRATCH MANOUKIAN, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued September 30, 1986.
Decided January 20, 1987.
*12 Before Judges PRESSLER, BAIME and ASHBEY.
George L. Schneider argued the cause for appellant (Carella, Byrne, Baine & Gilfillan, attorneys; Peter G. Stewart and Kenneth L. Winters, on the brief).
*13 S.M. Chris Franzblau argued the cause for respondent (Franzblau, Falkin & Goldman, attorneys; Richard M. Goldman, on the brief).
Jan Alan Brody argued the cause for amicus curiae Medical and Dental Staff of St. Mary's Hospital (Cecchi and Politan, attorneys; Jan Alan Brody, on the brief).
The opinion of the court was delivered by PRESSLER, P.J.A.D.
The dramatic developments in the law of defamation which have taken place during the past two decades have, in large measure and certainly in this jurisdiction, focused primarily upon the competing demands of constitutionally guaranteed free speech and personal reputational interests in the context of public debate and comment on issues of public concern. This defamation action requires us to reexamine, in the light of the principles which have evolved in that context, the predicates and operational parameters of the so-called conditional occasional or special-interest privilege involving limited publication by, to and about essentially private persons bound together by a specific, identifiable transactional relationship.
The questions we must here address arise out of a defamation and malicious interference action brought by an anesthesiologist, plaintiff Frederick Bainhauer, against a general surgeon, defendant Hratch Manoukian, both of whom were on the medical staff of St. Mary's Hospital in Orange in 1982 when the events here took place. The gravamen of the complaint was Bainhauer's claim that he was falsely, maliciously and improperly blamed by Manoukian for the recovery room death of a surgical patient of Manoukian to whom Bainhauer had administered anesthesia. It was Bainhauer's further claim that Manoukian's publication of this defamatory accusation within the immediate hospital community was the substantial contributing cause of his loss of that employment and his ultimate inability to find further employment in his professional specialty. *14 Following a trial, the jury returned a verdict in Bainhauer's favor awarding him compensatory damages in the amount of $400,000 and punitive damages in the amount of $200,000. We are satisfied that the verdict rests upon substantial legal error. Accordingly, we reverse and remand for a new trial.
Because of the number and complexity of the issues here involved, a detailed exposition of the facts is necessary. Dr. Manoukian, a board-certified general surgeon, had been an attending physician at St. Mary's Hospital since 1972 and, in early 1982, was in his third year as chief of surgery. At that time, there was no separate department of anesthesiology at the hospital but rather a three-member anesthesia service within the department of surgery, which consisted of Dr. Joseph Lutz, chief of the service since 1976, Dr. Shan Nagendra, and plaintiff Bainhauer, all of whom were board-certified anesthesiologists. Bainhauer had come to St. Mary's from Wyoming in September 1981 at Lutz's invitation.
In January 1982 Manoukian, so he testified, had two disquieting experiences with Bainhauer. The first involved a patient, J.P., upon whom Manoukian operated to drain an infected, abscessed pilonidal cyst. Bainhauer, despite Manoukian's objections, chose to anesthetize the patient with epidural anesthesia, a procedure requiring injection in the area of the abscess and the consequent risk that the infection would penetrate to the spinal canal. Although the patient suffered no ill effects, Manoukian was of the view that Bainhauer had employed an improper and, in the circumstances, unnecessarily dangerous anesthesia mode.[1] The second case involved a cholecystectomy, *15 that is, a gallbladder removal, performed on Dr. M. While preparing the patient's abdomen for incision, Manoukian noticed it becoming distended and asked Bainhauer if he was sure the tube Bainhauer had inserted in the patient to carry oxygen to his lungs had been properly placed. Bainhauer assured him several times that that was so. The patient's abdomen, as Manoukian described it, nevertheless "was still getting bigger." Concerned, indeed "panicky," because of the probability that the patient was not receiving oxygen because of the erroneous insertion of the tube into the esophagus instead of the trachea, Manoukian instructed the circulating nurse to call Lutz. Lutz arrived, removed the tube and reinserted it properly. The operation continued without untoward consequences. The troubling fact to Manoukian was not the improper insertion itself  that apparently is not an extraordinary occurrence  but rather Bainhauer's continued assurances that all was well. As Manoukian explained it, Bainhauer
didn't give me the benefit of the doubt of checking the tube to see whether it's in the right place or not. Now, I don't care how difficult the insertion of the tube is. If there's a question, the simplest thing to do is check and make sure there is nothing unusual or abnormal in the position of the tube, and that benefit I didn't even get. That was very disturbing. I had to get somebody else to help me because I didn't want to have  this is a patient.
The events giving rise to this complaint commenced on the morning of February 17, 1982, when Manoukian performed a cholecystectomy on H.W., a diabetic with both coronary and pulmonary problems who had been admitted to the hospital by her internist several days earlier with severe abdominal distress and generalized infection. Manoukian diagnosed her problem as acute gallbladder disease and scheduled the cholecystectomy after stabilizing her general condition and localizing the infection by means of intravenously administered antibiotics. Based on the anesthesia service's rotation system, Lutz assigned *16 Bainhauer as the anesthesiologist. Shortly after making his incision into the abdominal cavity, Manoukian noticed the darkening color of H.W.'s blood, a phenomenon indicating that she was receiving insufficient oxygen. He immediately brought this fact to Bainhauer's attention, telling Bainhauer that if there were a problem, he would stop the operation immediately. Manoukian's special concern, as he testified at trial, was H.W.'s diabetic condition "because diabetics are known to have significant amount of disease of the vessels that any kind of compromise of blood supply with oxygen would initiate those irregularities of the heart and eventually cardiac arrest." In any event, Bainhauer assured Manoukian that everything was all right, that H.W. had had an episode of bronchospasm under anesthesia but that he was reversing it with an appropriate drug, Isuprel. Manoukian therefore continued with the surgery, removing what he found to be a badly infected, gangrenous, "dead" gallbladder.[2]
The patient was taken to the recovery room at 9:05 a.m. in, as reported by Bainhauer, fair condition. Within the next five or ten minutes, Manoukian dictated his operative report and at 9:20 a.m. started his second operation of the day, again with Bainhauer as the anesthesiologist. During the course of that operation, he was told that H.W. had suffered a cardiac arrest in the recovery room. He and Bainhauer completed their *17 surgery and then went to the recovery room, where Dr. Nagendra, assisted by nurses, was still attempting to resuscitate H.W.[3] These efforts failed and she died shortly before 10:00 a.m. Manoukian, thinking that H.W. would recover when she was taken from the operating room, was extremely upset by her death, which he believed to have been caused by the manner in which the anesthesia had been administered, a belief supported by his two previous unhappy experiences with Bainhauer.
The first of the alleged defamatory statements was made within minutes after H.W.'s death. Manoukian went to Lutz's office, which was next to the recovery room. Lutz described him as "very, very upset." According to Lutz, Manoukian said, "I don't want Dr. Bainhauer to administer anesthesia to any of my patients anymore because he just killed my patient" or words constituting "a variation on that theme." According to Manoukian, he used a different form of language, telling Lutz that he, Manoukian, believed a lack of oxygen had precipitated H.W.'s fatal cardiac arrest and, in view of the two earlier cases, which he testified that he then described to Lutz, he could no longer feel comfortable with Bainhauer. As he recalled the conversation, what he said to Lutz was that after these three cases, "I'm going to let him give anesthesia? I must be crazy to take the risk and expose my patients to these kinds of problems. I don't need it." Although Lutz did not recall Manoukian's reference to the first two cases at that time, both recalled that Lutz told Manoukian that the matter would be looked into. Manoukian then left Lutz's office to tell H.W.'s family of her death and make postmortem arrangements.
*18 The second alleged defamation, also a slander, was not pleaded and was submitted to the jury as part of the cause of action as a result of the trial judge's grant, over Manoukian's objection, of Bainhauer's motion, made at the close of the proofs, for amendment of the complaint pursuant to R. 4:9-2 to conform to the evidence. Although Lutz, during the course of the extensive pretrial discovery, had never made any such statement, he testified at trial that when Manoukian left his office on that fateful morning, he heard him talking to two other surgeons in the hallway, Dr. O'Connor and his partner, Dr. Cuomo, telling them in some form of language that Bainhauer was responsible for the death of his patient. O'Connor, who testified on defendant's case, denied that Manoukian had ever talked to him about Bainhauer but was not specifically asked about the alleged hallway conversation. Cuomo was not called to testify at all.
The third alleged defamation, this time a libel, took place on the following day. It consisted of a letter written by Manoukian on February 18, 1982 to Dr. James J. Coyne, Chairman of the Executive Committee of St. Mary's and President of the Medical and Dental Staff. The full text of the letter reads as follows: "As per my conversation with Doctor Lutz, I would refuse to have Doctor Bainhauer give anesthesia to any of my patients in the future."
Dr. Coyne responded to the letter by initiating procedures consistent with the hospital's constitution and by-laws for the purpose of investigating what he understood to be a complaint by one physician against another. Apparently, the first of these procedures was the early March meeting of the Executive Committee, which considered the anesthesia service in general and Bainhauer in particular. In respect of the former, it appears undisputed that there was a long history of friction between the anesthesiologists and the some 25 to 30 surgeons comprising the attending surgical staff of the hospital. At least part of the problem was attributed by Lutz to the hospital's refusal to make the anesthesia service a separate department. In respect of Bainhauer individually, it appears that the *19 Executive Committee was concerned not only with Manoukian's letter but with other problems, including Bainhauer's use of a tape recorder to record inter-staff conversations, a charge he denied; his use of a personal portable anesthesia tray, which he had been asked to stop using; and his use of a preprinted form for making his anesthesia administration records. He was asked to submit the form to the Committee for approval before using it again. In any event, among the steps taken by the Executive Committee at that meeting was the authorization to Coyne to appoint an ad hoc anesthesia committee to "gather the grievances against this service" and the decision to retain an outside consultant in anesthesia to "review every aspect of this service, grievances, personnel and the administration of the service." The Executive Committee also instructed Coyne to ask Manoukian for a further letter documenting his grievances against Bainhauer. Finally, the Committee agreed to table Dr. Lutz's request to form a separate anesthesia department.
The fourth and final alleged defamation was Manoukian's letter responding to Coyne's documentation request. That letter, dated March 25, 1982, reads in full as follows:
Dear Doctor Coyne:
In response to your letter inquiring about the reasons why I refuse to have Doctor Bainhauer give Anesthesia to my patients I had the following unfortunate experiences which made me decide.
On January 22, 1982, [J.P.]: Pilonidal abscess with cellulitis had an epidural in spite of my insistence against it, due to the inflammatory process locally which could have affected the spinal cord.
On January 26, 1982, [Dr. M.]: He was being intubated for cholecystectomy. While prepping patient I repeatedly questioned him about the placement of the tube because of abdominal distention. My comments were disregarded and he continued to pump oxygen into the tube. I had to ask the nurse to call Doctor Lutz to check the situation.
On February 17, 1982, [H.W.]: She had a cholecystectomy. During the procedure I remarked repeatedly that the blood was very dark. I was told that this was due to a bronchial spasm and to continue with the operation. In the Recovery Room, less than one-half hour after the procedure was over, the patient had cardiac arrest.
In view of all this above, I would feel very uncomfortable to have the anesthetic responsibility while doing surgery.
Sincerely,
Hratch Manoukian, M.D.
*20 The events which followed culminated in Bainhauer's resignation from St. Mary's in November 1982. On the day following Manoukian's March response to Coyne, the ad hoc anesthesia committee met, its minutes suggesting that its agenda consisted primarily of affording an opportunity for the venting of grievances which the surgeons and anesthesiologists had against each other and which focused on Bainhauer, who was defended by Lutz. Lutz expressed his own grievances, including the reduction in the salary the hospital had agreed to pay him for administering the service and the continued refusal to create a separate anesthesia department. During the next several months there was obviously considerable turmoil in the surgery department. Various standing and ad hoc committees met to consider the anesthesia service problems. The New Jersey State Society of Anesthesiologists had been asked to and did evaluate the service. Lutz resigned at the end of April 1982, and his offer to withdraw his resignation after the hospital decided to establish a separate anesthesia department was rejected. Nagendra was named as acting chief of the anesthesia service and then chief of the new department, and Nagendra and Bainhauer formed a partnership by oral agreement.
In the early fall of 1982, Bainhauer's status was again focused on. All staff physicians at St. Mary's are reappointed annually, the process consisting of a recommendation by the department chief to the Credentials Committee, a recommendation by the Credentials Committee to the Executive Committee, and a recommendation by the Executive Committee to the Board of Trustees, with an opportunity provided for a so-called "due process hearing" by the Executive Committee in the case of an unfavorable recommendation. In October 1982 Nagendra dissolved his partnership with Bainhauer and wrote to the hospital president, Sister Mary Fidelise, to advise her that he would not be recommending Bainhauer for reappointment because the

*21 situation has become a major problem in this department. Unfortunately many surgeons do not want him to administer anesthesia to their patients. This number has increased and reached a point that his stay in the department is not possible.
I have discussed this problem on several occasions since May 28, 1982 the time I became in charge. He made attempts to correct the situation but it has not worked out.
Nagendra's letter was accompanied by a list of thirteen surgeons, approximately one-half the total number of attending surgeons, who had expressed to him their negative views about Bainhauer and who did not want to operate with him. The Credentials Committee accepted Nagendra's non-reappointment recommendation on October 21, 1982, and so reported to the Executive Committee. At its meeting of November 2, 1982, the Executive Committee, preliminarily concurring with the Credentials Committee, authorized Coyne to discuss the matter further with Bainhauer. Coyne did so, explaining to Bainhauer that the Executive Committee would afford him a "due process hearing" at his request. Bainhauer decided to forego the hearing and instead submitted a letter of resignation. Although the letter stated that he was resigning because of physical problems, he admitted at trial that that explanation was merely a face-saving device.
Because of the issues here presented, we find it necessary to explain the reasons for Nagendra's negative recommendation and the trial proof in support thereof. Nagendra testified at trial that while he had not asked the thirteen doctors whose names appeared on his list of dissatisfied surgeons for permission to include them on the list, he had prepared the list based on complaints which they had made to him, as department chairman, during the preceding months. Three of the thirteen doctors on Nagendra's list, Doctors Walsh, Di Benedetto and Curi, testified as to the specific incidents which caused them to distrust Bainhauer. Dr. Walsh, an obstetrician-gynecologist, explained that he had had a progressive loss of confidence in Bainhauer because he found him not to be sufficiently attentive to the patients' blood pressure and because he had technical *22 problems in intubating patients. Walsh was further concerned because Bainhauer refused to acknowledge that a tube might have been improperly positioned, requiring him, Walsh, to have to insist that the tube be checked. Ultimately, Walsh testified, he had a "total loss of confidence in his [Bainhauer's] performance as an anesthesiologist," which he reported to Nagendra.
Dr. Di Benedetto, an obstetrician-gynecologist, recalled two situations which had occurred prior to H.W.'s death in the recovery room. The first was the loss of teeth by one of his patients as a result of the intubation process. The other episode was considerably more serious. Di Benedetto was preparing to perform a hysterectomy on a patient who had cancer of the ovary and was expecting Bainhauer to administer general anesthesia. Seeing Bainhauer administering epidural anesthesia, he, Di Benedetto, expressed to Bainhauer his concern that epidural anesthesia was inappropriate since the operation site was higher in the abdomen than is usually safely reachable by epidural anesthesia. The problem worrying Di Benedetto was that if the epidural anesthesia extends too high, it may paralyze the diaphragm and block the nerves leading to the chest muscles, thereby interfering with the respiratory process. Bainhauer assured him that epidural anesthesia was perfectly appropriate and that he would properly position the patient. During the course of the surgery, one of the operating room nurses, not Bainhauer, noticed that the patient's fingernail beds were blue and that there was a flat line on the electrocardiogram monitor. It was she who gave the alert and, although the patient had in fact had a cardiac arrest, she was ultimately saved.
Dr. Curi, a vascular surgeon, testified to three incidents which persuaded him to avoid Bainhauer's services. The first involved an operation he was performing on an elderly woman. Curi had ordered that 3,000 units of Heparin, an anticoagulant, be administered intravenously during the surgery. The administration of the drug was the anesthesiologist's responsibility. During the operation Curi noticed that the "operative field now *23 was what appeared to be severely anticoagulated." He asked Bainhauer how much Heparin he had administered, and Bainhauer repeatedly assured him that it was the 3,000 units ordered. Curi, still disturbed by the extreme anticoagulation, finally insisted that he be shown the empty ampules which Bainhauer had used. Since Bainhauer did not respond, one of the nurses retrieved them from the trash basket and brought them to Curi. The label on the ampules showed that each had contained 5,000 units rather than the 1,000 units Bainhauer had assumed them to contain, as a result of which the patient had received five times as much Heparin as she should have had. Once the discovery was made, the patient was saved by the administration of a reversing drug. The next patient of Curi's was not so fortunate. Curi had done vascular surgery on that patient to restore blood circulation on his leg and had left him doing well in the recovery room where, when Curi last saw him, he was still intubated in order to receive oxygen to counteract the effects of the anesthesia from which he had not yet fully recovered. For some reason, the recovery room had to be closed before the patient was ready to be returned to his own room. The nurse in charge of the recovery room asked Bainhauer to accompany the patient to the intensive care unit for continued care and observation. When Bainhauer, the nurse and the patient reached the elevator, the oxygen supply attached to the patient's stretcher ran out and by the time the patient reached the intensive care unit, he had a cardiac arrest caused by lack of oxygen and could not be resuscitated. The final incident to which Curi testified involved a patient for whom he had requested intubation. Bainhauer did not intubate the patient but used a mask technique instead. It was Curi's opinion that as a result of not receiving the adequate amount of oxygen during the operation which intubation would have provided, the patient developed post-operative atelectasis (collapse of part of the lung) and pneumonia. He eventually recovered. Curi reported all of these episodes to Nagendra.
*24 Nagendra himself testified as to specific complaints made to him by doctors whose names were on his list but who did not testify. The most notable of these include the following: In one case Bainhauer had administered general anesthesia to an elderly patient scheduled for eye surgery under local anesthesia by Dr. Angiuoli. He had to reverse the general anesthesia before the surgery could be performed. As Nagendra testified, "So it was a whole disturbance in the sequence in an elderly patient," and Angiuoli said, "That's it." A patient of Dr. Madaras given anesthesia by Bainhauer had a completely unexpected respiratory arrest in the recovery room. Although the patient was resuscitated, Madaras asked Nagendra not to assign him Bainhauer in the future. Dr. Marucci made the same request after a patient of his had had a heart attack immediately after anesthesia administered by Bainhauer. The same request was made by Dr. Patel, one of whose patients who was given anesthesia by Bainhauer died unexpectedly in the recovery room. Dr. Akos, an otolaryngologist, refused to have Bainhauer perform anesthesia on patients with throat problems because of Bainhauer's difficulty in intubating. Three doctors in addition to those on Nagendra's list also testified. One had been assisting Di Benedetto in the ovarian cancer case. The second was that patient's internist, and the third was an orthopedic surgeon who had requested both Lutz and Nagendra not to assign Bainhauer to his high-risk cases because of his difficulties both in administering spinal-type anesthesia and in intubating patients during the induction of anesthesia. Bainhauer, on rebuttal, addressed some but not all of these incidents. He did not deny that they had taken place but gave a variety of exculpatory explanations, admitting fault only in the Heparin case, in which he claimed that only one of the ampules had the excessive amount.
In view of the amount of the damages verdict returned by the jury, some reference to Bainhauer's personal history following his resignation from the St. Mary's staff is necessary. Upon leaving St. Mary's in November 1982, Bainhauer obtained a *25 position as an anesthesiologist at Greenville Hospital in Jersey City. He resigned from Greenville on April 1, 1983, testifying that among his reasons were his fear that Greenville Hospital was about to become insolvent, that the equipment he was required to use was old, and that there was a constant draft in the operating room. Although not ascribed by him as a reason, the fact, however, is that in the spring of 1983 Bainhauer was indicted in the federal district court in Pennsylvania on charges of using the mail to commit Blue Shield fraud. He pleaded nolo contendere in May 1983, was sentenced to five years of probation, which included 50 weekends of work release at a facility in New Jersey, and was required to make restitution of $27,000. As a result of the federal conviction, his license to practice medicine was suspended in both Pennsylvania and New Jersey. The order of the New Jersey Board of Medical Examiners prohibited his practice between May 1984 and January 1985 and placed him on a five-year probationary period thereafter. He was suspended from active practice in Pennsylvania from September 1985 through December 1985, followed by an 18-month probation. He has not worked as an anesthesiologist since leaving Greenville.
There is one final factual matter which requires discussion. As heretofore indicated, Manoukian dictated his report of H.W.'s operation within minutes after its conclusion and certainly well before he had any knowledge of the recovery room disaster. The report was dictated by means of a telephone line connected to a dictating machine in the records room and, in accordance with the hospital's usual procedure, was thereafter transcribed by clerical personnel. The report referred twice to the patient's darkening blood and to the anesthesiologist's assurance that there was a temporary bronchial spasm and that the operation should proceed. In its description of the actual surgical procedure, the report stated the following:

Appendectomy was proceeded with because of the gangrenous appendix and extreme adhesions of the omentum to the gallbladder. The gallbladder was removed in retrograde fashion, due to extreme necrotic and infectious process a *26 culture was taken. The gallbladder was removed in retrograde fashion. The bleeders were clamped and tied with 2-0 chromic ties. The cystic area was identified down at the junction with the common duct and then was divided and tied with 2-0 chromic. After adequate hemostasis the whole area was irrigated with a large amount of saline and a large hemovac was inserted in Morison's pouch. After this was done the peritoneum was closed with continuous 3-0 chromic suture. Rectus sheath approximated with interrupted 0 chromic. Three retention sutures were applied and the skin was closed with a stapler. (Emphasis added)
Nothing in the patient's preoperative hospital record made any reference to an appendectomy, an appendectomy had not been scheduled, and as far as Manoukian was concerned, the possibility of appendicitis had never entered his calculations. He was operating to remove the gallbladder, found it necrotic and gangrenous, removed it, and concluded the surgery. The reference in his report to "appendectomy" and "appendix" were, he explained, simply a question of his misspeaking, and he did not pick up the erroneous usage when he signed the transcribed report.
The significance of these references to the appendix in the operative report is that they ultimately constituted the factual and conceptual basis of Bainhauer's entire case. This occurred because the postmortem examination of H.W. showed that she had in fact had at the time of her death a ruptured acute suppurative appendix. In effect, Bainhauer's theory of the case was that Manoukian somehow knew when he performed the gallbladder surgery on H.W. that she also had a ruptured appendix but that he had failed to remove it and that this failure resulted in her recovery room death. The suggestion is that the operative report referred to an appendectomy because Manoukian knew he should have performed an appendectomy as well as a cholecystectomy and that he blamed Bainhauer for the recovery room death only in order to shift the blame from himself to Bainhauer.
Lutz, the only witness on the plaintiff's direct case other than Bainhauer himself, opined that the cause of death might have been a multiple system collapse following a generalized sepsis exacerbated by the appendicitis. Lutz, however, in the anesthesia *27 service's mortality report on H.W., prepared after the autopsy had disclosed the appendix problem, made the following chairman's Comment:
Multiple organ system failure (heart, lung, kidneys, liver, etc.) involving sepsis are most difficult intensive care problems; also importance of I.V. nutrition in days preceding surgery should be noted. Was there also inadequate reversal of pancuronium bromide [the anesthetic medium] by prostigmine?
Lutz also testified that the bronchospasm suffered by H.W. and which may well have contributed to her ultimate cardiac arrest is sometimes caused by the commencement of surgery before the patient is completely anesthetized. Manoukian and his witnesses, particularly Nagendra, remained of the view that H.W. had suffered an "anesthetic death" and that the appendicitis did not cause it since the infection had already been controlled and localized with antibiotics and, in any event, death from a ruptured appendix is not sudden.[4] Peculiarly, it was the trial judge who provided the impetus for the theory of appendicitis as the cause of death. During the course of his testimony, Lutz pointed out that the autopsy report had revealed "cardiac arrest; post operative cholecystectomy; ruptured acute suppurative appendicitis." In a colloquy at sidebar respecting the admission into evidence of the autopsy report, the judge asked what the death certificate showed as to cause of death. Both *28 lawyers said that they had not seen the death certificate, that it in fact had never "come up." The trial judge then opined that "the death certificate will say cause of death. It is made out by the same man who made the autopsy report, or should be  whatever it says, it says. It is an official record, but I would say you better get the death certificate and see what that says." Plaintiff's attorney accordingly obtained the death certificate after the conclusion of that day's trial proceedings and showed it to Lutz on redirect examination the next morning. Lutz was asked to read to the jury the following portion of the certificate:
27(a) Immediate cause: cardiac arrest
27(b) Due to or as a consequence of: post cholecystectomy due to or as a consequence of ruptured acute suppurative appendicitis.
The certificate was then admitted into evidence. Defendant's attorney sought to call Dr. Roy, the coroner who had prepared both the autopsy report and the death certificate, to explain the statements he had made on the certificate respecting the secondary cause of death. The trial judge refused to permit Roy to testify since his name had not been furnished in discovery and presumably because of the court's view that the cause stated in the certificate was somehow conclusive.
Prior to submitting the case to the jury, the judge concluded that the two oral statements allegedly made by Manoukian were slanderous per se and hence not privileged. He did, however, conclude that the two written communications were privileged. Therefore, as he framed the issues for the jury, he instructed it to determine, as to the two oral statements, what had been said and if what had been said was defamatory. He further instructed it as follows:
For the making of a slanderous statement the defendant must respond to the plaintiff in damages even though the defendant's purpose in making the statement was well intentioned and even though the statement was the result of an honest mistake of fact on the part of the defendant.
So, you see here, in this particular instance even if Dr. Manoukian felt that the cause of death of [H.W.] was the responsibility of Dr. Bainhauer and if that was not so, that's of no moment as far as you are concerned.
*29 With respect to the two written communications, the judge told the jury that he had found them to be privileged, without however specifically explaining the nature or the source of the privilege. He instructed the jury that it would have to determine if it was "the honest belief of Dr. Manoukian that Dr. Bainhauer was not the man that he wanted to give anesthesia to his patients or was it malicious, as contended by Dr. Bainhauer, that there was no good reason why Dr. Manoukian took that attitude." He defined malice by way of several varying formulations, including such phrases as knowledge of falsity, reckless disregard, ill temper, ill will, and spite. After instructing the jury as to compensatory damages, punitive damages, and the cause of action of malicious interference with prospective economic advantage, the judge submitted six interrogatories to the jury, five of which related to the defamation case. The first two questions addressed the two oral statements and asked the jury to determine if, by each, defendant had defamed plaintiff. The next two questions addressed the two written communications, asking, in each case, if the letter was defamatory. The fifth question asked if Manoukian had tortiously interfered with plaintiff's expectation of economic advantage. The sixth question asked for an assessment of compensatory and punitive damages, if any. Early in its deliberations, the jury asked this question, "What does a privileged letter involve and at what point does it become defamatory? Please define malice in this respect?" The supplemental instructions generally followed the original instructions. Three-and-a-half hours later, the jury returned its verdict answering each of the first five questions in the affirmative, assessing compensatory damages at $400,000 and assessing punitive damages at $200,000. Defendant's subsequent motion for a new trial or remittitur was denied.
On appeal defendant argues that the trial judge erred both in permitting amendment of the complaint in order to include the second oral statement as part of the cause of action and in not permitting him to call the coroner, Dr. Roy, to testify respecting *30 the death certificate. He also argues that the damages were clearly excessive. While we agree with these contentions, each of which we address hereafter, we are persuaded that the basic error was, as defendant contends, the court's application of fundamental principles of the law of defamation and particularly the principles defining and governing conditional privileges.[5] In short, it is our conclusion (1) that the oral communications were as much subject to a conditional privilege as were the written communications; (2) that even if they were not, the above-quoted instruction to the jury was incorrect; (3) that the instructions to the jury respecting both privilege and abuse of privilege were in material respects confusing, incorrect and inadequate; and (4) that the damages flowing from Bainhauer's resignation from the St. Mary's staff were due to an independent intervening cause and were, therefore, not chargeable to any conduct on the part of Manoukian.[6]
The issues here raised must be considered in the light of the redefinition of the common law of defamation effected by New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). We need not engage in protracted analysis of these decisions in view of their recent review by our Supreme Court in Sisler v. Gannett Co., Inc., 104 N.J. 256 (1986); Dairy Stores, Inc. v. Sentinel Pub. Co., 104 N.J. 125 (1986); and Lawrence v. Bauer Pub. & Print., Ltd., 89 N.J. 451, cert. den. 459 U.S. 999, 103 S.Ct. 358, 74 *31 L.Ed.2d 395 (1982). It suffices for our purposes to point out that the essential principle of New York Times and Gertz is the proposition that, as a matter of First Amendment imperative, an exercise of defamatory speech is not actionable absent fault on the part of the speaker. Thus, fault, by whatever standard it is to be measured, is as much an element of the cause of action as the defamatory publication itself. Where public officials and other public figures are aggrieved by defamatory publications, the constitutionally mandated standard of fault which constitutes that element of the cause of action is the defendant's knowledge that the defamatory statement is false or his reckless disregard of its truth or falsity. See also Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). This is the familiar rubric of "actual malice" which has come to be known simply as the New York Times rule. As it has been refined, the "reckless" alternative of the rule has also been expressed as "whether the defendant in fact entertained serious doubts as to the truth of his publication." St. Amant v. Thompson, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262, 267 (1968). And see Dairy Stores, Inc., supra, 104 N.J. at 149.
Where private persons are aggrieved, federal constitutional considerations do not demand a New York Times rule standard of fault but only that there be some standard of fault sufficient to overcome what had been the traditional common-law imposition of strict liability for false defamatory publication. The precise fashioning of the private-person standard of fault is consequently a matter of state prerogative. As Gertz pronounced:
We hold that, so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual. This approach provides a more equitable boundary between the competing concerns involved here. It recognizes the strength of the legitimate state interest in compensating private individuals for wrongful injury to reputation, yet shields the press and broadcast media from the rigors of strict liability for *32 defamation. [418 U.S. 347-348, 94 S.Ct. 310-311; footnote omitted; emphasis added][7]
Because many states have adopted an ordinary negligence standard in respect of private persons and because that standard represents the least radical departure from common law, that is the standard which the American Law Institute codified in respect of private-person plaintiffs in its 1976 adoption of 3 Restatement, Torts 2d, Defamation, §§ 558-623 at 154-331 allocating the fault sections to Topic 1, the portion which defines the cause of action. Accordingly, § 580A, dealing with publication of false and defamatory statements concerning "a public official or a public figure in regard to his conduct, fitness or role in that capacity," states that liability will attach only if the speaker
(a) knows that the statement is false and that it defames the other person, or
(b) acts in reckless disregard of these matters.
Section 580B, dealing with publication of false and defamatory communications concerning "a private person, or concerning a public official or public figure in relation to a purely private matter not affecting his conduct, fitness or role in his public capacity," states that liability will attach only if the speaker
(a) knows that the statement is false and that it defames the other,
(b) acts in reckless disregard of these matters, or

*33 (c) acts negligently in failing to ascertain them.[8]
For reasons we state hereafter, resolution of the issues before us does not require us to linger on the choice New Jersey is making in respect of the private-person fault standard. We simply note that Sisler, while apparently not rejecting a negligence standard in toto, has nevertheless, in effect, opted to apply the New York Times rule of § 580A at least to "a private person with sufficient experience, understanding and knowledge [who] enters into a personal transaction or conducts his personal affairs in a manner that one in his position would reasonably expect implicates a legitimate public interest with an attendant risk of publicity...." Sisler, supra, 104 N.J. at 279. The point that engages us is simply that as a consequence *34 of New York Times-Gertz, common-law strict liability has been replaced by, at the least, a negligence standard of fault and, consequently, the trial judge's strict-liability instruction to the jury respecting the two oral publications he had held not to have been privileged is no longer an accurate statement of the law.[9]
What concerns us most directly is the relationship between the fault component of the defamation cause of action and the entire concept of occasional or special-interest privilege. We note first that the stringency of the New York Times rule as a fault standard constitutes adequate protection for defamers of public persons and other public figures entirely apart from any notion of privilege. Indeed, it constitutes a better protection since it is the plaintiff who has the burden of proving the requisite fault element of the cause whereas if privilege is relied upon, it is the defendant who has the burden of proof on that issue. See Restatement, supra, § 613(1)(g) and (2) at 307. It appears to us, therefore, that whenever the New York Times rule of fault as stated by § 580A applies, consideration of privilege is an apparent redundancy, at least where application of the New York Times rule is compelled by the policy of encouraging public debate and comment on issues of public concern.[10]
*35 In any event, we are dealing here not with a claim of privilege based directly on that policy but rather with the *36 historical, traditional common-law privilege which arises out of a legitimate and reasonable need, in particular situations, for private people to be able freely to express private concerns to a limited and correlatively concerned audience, whether or not those concerns also touch upon the public interest in the broad sense. This is the privilege categorized by the Restatement as the conditional privilege arising from an occasion to which we have also referred as a conditional special-interest privilege. See Restatement, supra, § 594 at 263.
The nature and scope of the conditional occasional privilege has been well-defined in this jurisdiction. As stated by Chief Justice Weintraub in Coleman v. Newark Morning Ledger Co., 29 N.J. 357, 375 (1959), quoting Lawless v. Muller, 99 N.J.L. 9 (Sup.Ct. 1923), "[a] communication `made bona fide upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty, is privileged if made to a person having a corresponding interest or duty, although it contains criminatory matter which, without this privilege, would be slanderous and actionable.'" See also Dijkstra v. Westerink, 168 N.J. Super. 128, 135 (App.Div. 1979), certif. den. 81 N.J. 329 (1979); Novack v. Cities Service Oil Company, 149 N.J. Super. 542, 552 (Law Div. 1977), aff'd sub nom. Novak v. Cities Service Oil Company, 159 N.J. Super. 400 (App.Div. 1978), certif. den. 78 N.J. 396 (1978); Krumholz v. TRW, Inc., 142 N.J. Super. 80 (App.Div. 1976), certif. den. 71 N.J. 532 (1976); Sokolay v. Edlin, 65 N.J. Super. 112, 123-124 (App.Div. 1961); Murphy v. Johns-Manville Products Corp., 45 N.J. Super. 478 (App.Div. 1957), certif. den. 25 N.J. 55 (1957). And see Restatement, supra, §§ 594, 595 and 596, recognizing a conditional occasional privilege where the publisher is, respectively, protecting his own interest, the interest of the recipient or other third person, or an interest common to the publisher and the recipient.[11] Thus, the critical test of the existence of *37 the privilege is the circumstantial justification for the publication of the defamatory information. The critical elements of this test are the appropriateness of the occasion on which the defamatory information is published, the legitimacy of the interest thereby sought to be protected or promoted, and the pertinence of the receipt of that information by the recipient.
Clearly, the general definition of the occasional privilege is unaffected by New York Times-Gertz, whose impact is, rather, on the loss or abuse of the privilege. With respect to the existence of the privilege, we are satisfied that each of the four statements here, not just the two written statements, come within the ambit of an occasional privilege. Each physician within a hospital community has a significant and obvious interest in the professional qualification, skill and competence of every other health-care professional rendering services within *38 that community and particularly those with whom he or she works directly. The welfare of patients, the reputation of the hospital, the physician's own ability properly to treat and protect patients, and the physician's own professional reputation are all implicated. Moreover, the public relies on the professional judgments of the hospital community to assure it of the professional skill, qualification, and competence of the medical staff it provides and to take whatever steps are appropriate to that end. This is singularly so when hospital staff personnel are beyond the patient's choice. Although a patient may choose his surgeon, he does not typically choose his anesthesiologist any more than he chooses his nurse or lab technician. It is therefore not only the physician's self-interest but also the public's interest which demands that hospital staff physicians be free to express themselves openly and without fear of reprisal when matters directly affecting the quality of health care are involved. Indeed, we regard such expression as, at the least, a moral duty of each physician. In any event, we have no doubt that an individual physician's significant interest in his own reputation produces a lesser weight on the balance scale than the aggregate of the public and private interests served by encouraging physicians to speak out when, in their professional judgment, a colleague's skill and qualification are questionable. See, e.g., Sussman v. Overlook Hospital Assn., 95 N.J. Super. 418 (App.Div. 1967). See also, recognizing the public interest in hospital delivery of quality health care, Berman v. Valley Hospital, 103 N.J. 100 (1986); Desai v. St. Barnabas Medical Center, 103 N.J. 79 (1986); Garrow v. Elizabeth General Hospital & Dispensary, 79 N.J. 549 (1979); Falcone v. Middlesex Co. Medical Soc., 34 N.J. 582, 596-597 (1961). And see N.J.S.A. 2A:84A-22.10, according a conditional privilege to physicians involved in hospital peer review.
Insofar as we are able to determine from the record, the trial judge concluded that the two letters Manoukian wrote to Coyne were privileged because Coyne, as President of the Medical Staff and Chairman of the Executive Committee, was *39 an appropriate recipient of Manoukian's concerns about Bainhauer's professional performance. We agree with this evaluation, but we are also convinced that the same evaluation applies to the two oral statements, assuming that both were made and made in the manner Lutz described. As to the first statement, whatever form of language was used, it is nevertheless clear that what Manoukian was telling Lutz was that Bainhauer had made a professional error in his care of the patient and that he, Manoukian, did not wish to work with him. The fact that the statement, if false, was slanderous per se is entirely irrelevant to the question of whether it was privileged.[12] It is, moreover, obvious that Lutz was a proper recipient of that communication. He was Bainhauer's superior, prepared the rotation schedule for the anesthesiologists, and was responsible for the initial annual reappointment recommendation for all anesthesiologists. Indeed, Lutz himself testified that he was the proper person to whom any complaint against an anesthesiologist should have been brought. Nor do we doubt that the second oral communication, allegedly made by Manoukian to two other surgeons in the hallway immediately upon leaving Lutz's office, was also privileged. All the surgeons had a community of interest in the performance of the hospital's three anesthesiologists. Hence, their patients' interest as well as their own professional interest justified the communication. See Restatement, supra, §§ 595 and 596. And see Sokolay v. Edlin, supra, 65 N.J. Super. at 112, finding a sufficient common interest to sustain the privilege where co-employees were told that another employee was guilty of theft from the employer. Clearly, then, the occasion giving rise to the privilege was the same in all four cases, namely, a patient's unexpected death in the recovery room *40 following the administration of general anesthesia. This occasion, moreover, brought into play all of the affected interests supporting the privilege, namely, the dependency of the surgeon on the anesthesiologist, the dependency of the patient on both, the hospital's ability to render quality health care and its reputation for so doing, and the public's interest in quality health care. The content of the alleged defamation was virtually identical in all four communications. And, in each case the recipient was correspondingly interested. All four communications, therefore, in respect of the privilege, were on an equal footing.
We address one final matter in respect of the existence of the privilege. As we have noted, the question of whether a defamatory statement is privileged is a determination which the judge rather than the jury must make. See, e.g., Lawrence v. Bauer Pub. & Print. Ltd., supra, 89 N.J. at 462. We understand that the judge's obligation is to determine if the circumstances of the communication, including the apparent interest justifying it and the identity of the recipient, entitle the communication to a privileged status. We note, however, that the New Jersey formulation of the occasional privilege also requires the communication to be bona fide. But, we do not understand that the judge is obliged to determine whether, as a matter of fact, the communication was actually made in good faith. We are satisfied that questions of motivation go rather to the determination of abuse of a privilege, a jury function. See, e.g., Barbetta Agency, Inc. v. Evening News Pub. Co., supra, 135 N.J. Super. at 218. In this respect the Restatement rule as stated in §§ 594 and 595 does not refer to good faith but, rather, to the question of whether "the circumstances induce a correct or reasonable belief" that there is information which it is in the interest of the speaker to communicate to a recipient whose knowledge of the information can serve to protect the interest. Hence, the judge-jury allocation by the Restatement is that the court determines "whether the occasion upon which the defendant published the defamatory matter *41 gives rise to a privilege" and the jury determines "whether the defendant abused a conditional privilege." Restatement, supra, § 619(1) and (2) at 316. We are satisfied that this formulation is consistent with the New Jersey rule and, consequently, that the so-called good faith test the judge must apply is the objective determination of whether the defamatory statement was on its face an apparently reasonable response to the circumstances. As so qualified, the trial judge's conclusion of privilege in respect of the two letters was clearly justified and requires, in turn, the same conclusion as to the two oral statements.
Having concluded that all four statements were entitled to the protection of an occasional privilege, we now consider the question of loss or abuse of privilege. As a matter of historical approach, the conditional occasional privilege was deemed lost if the communication was inspired by "express malice" or "malice in fact" in contradistinction to "implied malice" or "legal malice." The unsatisfactory nature of the malice standard has, however, long been recognized both by the case-law and academic authorities. Thus, in Coleman v. Newark Morning Ledger Co., supra, 29 N.J. at 374, the Supreme Court was moved to note that "the word `malice' * * * has plagued the law of defamation from the beginning * * *." See also Murphy v. Johns-Manville Products Corp., supra, 45 N.J. Super. at 495. And see W. Prosser, Torts § 113, at 772 (4th ed. 1971); W.P. Keeton, D. Dobbs, R. Keeton, D. Owen, Prosser & Keeton § 115, at 834 (5th ed. 1984); 2 F. Harper, F. James & O. Gray, Law of Torts § 5.27 at 232 (2d ed. 1986). Most recently Justice Pollock in Dairy Stores, Inc., supra, 104 N.J. at 151, observed that "`[m]alice' adds nothing to the legal analysis of an allegedly defamatory statement, and it can become a pitfall in the underbrush of the common law." Indeed, we are persuaded that the use of that term in the trial judge's instruction in its various inconsistent, contradictory, and equivocal formulations confused the jury and led to the legal and indeed logical error of the above-quoted question it asked by which it demonstrated *42 its hopeless muddle over the relationship among defamation, privilege and malice. We therefore gratefully accept the injunction of Dairy Stores to discard the label "malice" altogether.
Eliminating the term "malice," at least in the context of the abuse of the conditional occasional privilege, poses no serious problem. We regard the criteria for abuse of privilege as formulated by the Restatement to have significantly illuminated that entire subject. Since those criteria are consistent with our own case law and since their application avoids entirely the use of the term "malice," we opt to adopt them in respect of the conditional occasional privilege.
In essence, the Restatement formulates four discrete alternative circumstances under which the privilege may be abused. The first of these, as stated by § 600, goes to the speaker's knowledge of the falsity of the defamatory matter and adopts the New York Times rule. Thus, the privilege is lost if the speaker either knows the matter is false or acts in reckless disregard of its falsity. Conceptually then, where a conditional special-interest privilege exists, the plaintiff's burden of proof respecting its abuse is identical to his burden of proof of the higher fault component of the cause of action.[13]See Dairy Stores, supra, 104 N.J. at 151. Even if the New York Times rule has not been met, the speaker, as has long been recognized by our case law, can still otherwise abuse the *43 privilege. He will abuse it "if he does not act for the purpose of protecting the interest for the protection of which the privilege is given." Restatement, supra, § 603 at 291. And see, e.g., Murphy v. Johns-Manville Products Corp., supra, 45 N.J. Super. at 495. He will abuse it by excessive publication, that is, by publishing defamatory matter without a reasonable belief "that the publication is a proper means of communicating the defamatory matter to the person to whom its publication is privileged." Restatement, supra, § 604 at 292. And see, e.g., Sokolay v. Edlin, supra, 65 N.J. Super. at 125. Finally, he will abuse it "if he does not reasonably believe the matter to be necessary to accomplish the purpose for which the privilege is given." Restatement, supra, § 605 at 295. And see, e.g., Sokolay v. Edlin, supra.
In considering these four circumstances here, we conclude that as a matter of the trial proofs, the question of whether Manoukian abused the special interest privilege in making any of the four alleged defamatory statements involves only two factual disputes. The first is whether when the first three statements were made, all of which preceded the autopsy of H.W., Manoukian knew that the patient had a ruptured appendix which he should have but failed to remove. If he did not, then we are satisfied that there was nothing in this record which could have justified a jury finding that the privilege was abused, since absent that factual element, the record is barren of any suggestion to contradict the conclusion that in making the first three statements Manoukian, even if he was wrong, was nevertheless exercising his honest professional judgment in a manner consistent with his, the hospital's, and the public's interest. When the fourth defamatory statement was made, namely, the March 25th letter to Coyne, Manoukian already had been advised of the autopsy finding respecting H.W.'s appendicitis. As to this communication, the additional factual question was whether Manoukian, by reason of the autopsy report, came to believe that his initial appraisal of Bainhauer's care of H.W. *44 was incorrect and, hence, no longer believed when he wrote that letter that Bainhauer had been at fault.
Our review of the record and particularly the medical evidence suggests to us that the proofs on both of these issues were heavily weighted in Manoukian's favor and that Bainhauer's entire scenario built upon the appendicitis was in actuality a red herring drawn across the case. The question before us is whether they were so heavily weighted as to preclude a jury from deciding them in Bainhauer's favor. We are constrained to conclude that no matter how unlikely we think it was that Manoukian, prior to the autopsy report, had any notion that H.W. had a ruptured appendix, a jury might otherwise conclude if the question and its consequences were fairly and properly presented to it.
Because of our conclusion that the question of abuse of privilege must be retried, we need address only two of the rulings defendant here challenges. The first was the judge's refusal to permit him to call the coroner to testify respecting the death certificate. That ruling was in error. The necessity of calling that witness to explain the certificate's apparent attribution of the cause of death to appendicitis developed at trial when the judge himself requested production of the certificate. Moreover, while a death certificate may constitute admissible hearsay, its contents are not conclusively probative or in any respect unrebuttable. The autopsy report had only indicated appendicitis as a finding. The coroner's reasons for listing it as a secondary cause of death were, in the circumstances, highly probative, at least to the extent that the cause of death itself was relevant. In this regard, however, we again point out that the actual cause of death was not the critical question to be determined. The critical question was rather whether at any time between February 17, 1982 and March 25, 1982 Manoukian had any objective reason to believe that the appendicitis, not Bainhauer's performance, was the primary cause of H.W.'s death in the recovery room.
*45 We also conclude that the trial judge erred in permitting the complaint to be amended at the close of the proofs to add the second slander. We agree with defendant's contention that he did not have an adequate opportunity to meet the charge since he could not have known until after the proofs were closed that that alleged statement was to be a part of the cause of action. Obviously, one reacts differently to what appears to be a credibility issue than to what he understands or should understand to be a component of the cause of action itself. If plaintiff chooses on retrial to pursue the second oral statement as a separate alleged defamation, he should move to amend his complaint prior to retrial and the court should then consider the motion guided by the customary principles of R. 4:9-1.
The necessity of a retrial also requires us to address the damages issue. As to compensatory damages, we conclude that as a matter of law those pecuniary damages flowing from Bainhauer's loss of his position at St. Mary's Hospital are not attributable to Manoukian's conduct at all. Obviously, Manoukian could only be liable for those damages sustained by Bainhauer as to which Manoukian's conduct was a substantial causative factor. See Restatement, supra § 622A at 323. This record does not support the conclusion that Manoukian's conduct was a substantial factor in bringing about Bainhauer's decision to resign from the staff. As we have pointed out earlier, Bainhauer chose to resign rather than to proceed with the so-called due process hearing, which would have accorded him a fair opportunity, both substantively and procedurally, to meet the complaints made against him. He resigned in order to spare himself both the burden of fighting for reappointment and the stigma of any eventual loss of that fight. The reappointment process itself followed the procedures prescribed by the hospital's constitution and by-laws, and there is nothing in the record beyond the merest speculation to suggest that Manoukian had manipulated the process or had unduly influenced its course. The critical step in the reappointment process was *46 clearly Nagendra's unfavorable recommendation which rested upon serious complaints about Bainhauer from at least 12 other attending surgeons. It is not alleged that Manoukian conspired with Nagendra or with any of the other surgeons to produce either the negative recommendation or the making of the specific complaints. Nor is there any evidence in the record that he in fact so conspired. He was not even the first of the surgeons, according to Lutz, who had complained about Bainhauer. In short, this record contains no significant fact, either direct or by inference, to warrant a finding that Bainhauer's loss of employment at St. Mary's was caused by any circumstance other than the legitimate course of the reappointment process itself.
We further note that while hospital bodies performing personnel functions are obviously not governmental agencies, our case law ascribes to their decisions "many of the rules and guidelines that are applicable to judicial review of administrative agencies," tempered by a reliable-evidence standard of review. See, e.g., Desai v. St. Barnabas Medical Center, supra, 103 N.J. at 92. We are satisfied that the proofs here adduced compel the conclusion that the hospital's performance of that function in respect of Bainhauer, insofar as it had proceeded before being aborted by Bainhauer's resignation, met the test for judicial approval. We also believe, analogously to the doctrine of exhaustion of administrative remedies, that a physician undergoing the reappointment process ought ordinarily to see the process through before being able to charge a single individual with a wrongful interference in the process. We have already indicated that the basic factual questions here involved, as we see them, are largely questions requiring medical expertise for their resolution. Thus, while a layman might find plausible Bainhauer's "cover-up" theory predicated on the concurrence of Manoukian's use of the word "appendectomy" in the operative report and the actual appendicitis suffered by H.W., the weight of the medical opinion at trial persuasively contradicted that theory and supported Manoukian's explanation *47 that the operative report was a result of a dictation error, that he did not know H.W. had appendicitis until he had gotten the postmortem report, and that, in any event, the appendix was not the immediate cause of death.[14] We have no doubt that the Executive Committee's inquiry, investigation and determination of this dispute as well as its determination of the primary issue of Bainhauer's suitability for reappointment would have shed considerable light on the validity of the *48 alleged facts underlying his defamation claim and perhaps would have eliminated any real factual question in respect thereof. In any event, we remain persuaded from this record that, at the least, the non-reappointment itself and the personal consequences thereof to Bainhauer resulted primarily from the medical staff's decision based on a plethora of independent relevant evidence and not, significantly, on Manoukian's charges alone.
We have heretofore not referred to the second count of Bainhauer's complaint in which he alleges a cause of action for malicious interference with plaintiff's employment at St. Mary's. For the reasons we have just stated, we conclude that that cause of action does not lie, since, as we have said, the record does not support a finding that Manoukian's conduct was a substantial contributing cause of Bainhauer's loss of that employment. In any event, the malicious interference count of Bainhauer's complaint is expressly predicated on precisely the same facts as are alleged in the defamation count. Proof or failure of proof of the operative facts of the defamation count would, therefore, completely comprehend the malicious interference cause. Thus, if no abuse of privilege is found, then the "malicious" predicate of the interference count would also fail. If abuse of privilege is found, the malicious interference cause would add nothing to plaintiff's available remedies for defamation and would, therefore, be entirely duplicative of the defamation count. See Rainier's Dairies v. Raritan Valley Farms, Inc., 19 N.J. 552 (1955).
In summary, we hold that all of the statements made here were entitled to the protection of conditional occasional privilege, including the second oral statement which was the subject of an erroneous grant of the motion to amend the pleadings after the close of the proofs. Only the issue of abuse of privilege remains for resolution. Obviously, in order for the jury to determine whether the privilege has been abused, it will have to fully understand the nature of the privilege and the *49 specific interests, public and private, which warrant its application to the four communications here. The judge should, therefore, explain the privilege to the jury and then instruct it as to each of the four circumstances under which the privilege may be abused. If the jury is asked for a conclusionary response, the question should be formulated in terms of whether the privilege was abused and not, as was done here, in terms of whether the communication itself was defamatory. We further point out that the trial judge may also opt to submit special interrogatories to the jury respecting the factual questions we have heretofore identified. The damages instruction should also conform with the conclusions we have herein expressed.
Reversed and remanded for new trial.
NOTES
[1] Dr. David Belefer, Manoukian's expert witness in surgical matters and the only testifying physician wholly unconnected with St. Mary's, expressed the opinion that epidural anesthesia is always contraindicated in dealing with a pilonidal cyst because of the risk of dangerous infection. He further testified that he knows of no one "who would accept this epidural anesthesia for this technique." He also explained that he had spent 13 months in Thailand as an Army physician and treated dozens of pilonidal cysts, a more prevalent condition there because of the hot weather. The Army, he said, "has a very simple program for it. They absolutely forbade anyone to do an epidural spinal for this. It was a rule. Back in civilian life you don't work under these kinds of rules. Most physicians feel there should be."
[2] As Manoukian explained at trial, after being reassured by Bainhauer,

I removed the omental adhesion. I saw the gall bladder which was black, dead. Normally, it's whitish red, and this was a black gall bladder, completely dead. There was no blood supply to it. This is the stage that was causing the bacterial infection, and sepsis, all the things that go with the severe infection that she had that the omentum was trying to protect.
Without looking at anything else, without disturbing anything, because it's a surgical principle when you have infection like this you don't touch anything; you just take the diseased party out, and you get out as soon as you can. You don't want to waste any second because this patient had been sick before, and we had just controlled her condition pretty well, and this was an ideal situation to just get the gall bladder, and she was going to get better. So I took the gall bladder out as fast as I can....
[3] Bainhauer had testified, on plaintiff's case, that he was with H.W. from the time she left the operating room until her death, and that it was he who had attempted resuscitation. Nagendra testified that Bainhauer could not have been in the recovery room and was in fact not there until the conclusion of Manoukian's second operation, and that patient's chart apparently so indicated.
[4] Nagendra expressed his view as follows:

... If it was a death due to ruptured appendix, it is never a sudden death. Only a few cases can give you sudden death. One is a myocardial infarction, a massive stroke, and anesthesia. In that case it was a sudden death, and that was due to over relaxing the patient, and the patient was not ventilated, and that patient went into respiratory arrest.
Q. Take it just a little bit slower for me, if you would. The part that led you to conclude why it was an anesthetic death.
A. Because if it was a ruptured appendix, the causes are the sepsis, and with a sepsis you don't die immediately. It will take a few days, and only a very few things will give you a sudden death. That was because the relaxant, 
Q. That's part of the anesthesia?
A. That hangs on a long time and the patient should have been placed on a respirator in the recovery room, and the patient was not placed and had very shallow breathing, and ceased to breathe.
[5] We note that defendant does not challenge the defamatory categorization of the four statements and apparently abandoned the defense of truth at trial. In any event, no instruction relating to truth as a defense was requested.
[6] We do not intend undue criticism of the trial judge. We point out that in large measure his instructions followed §§ 3.11, 3.12 and 3.13 of the Model Jury Charges, Civil, approved by the New Jersey Supreme Court Committee on Model Jury Charges, Civil. It is our respectful view that the content of these charges requires reconsideration in the light of legal principles herein discussed.
[7] While Gertz speaks in terms of the press and broadcast media, it does not appear that its holding is intended to be so limited. We understand Gertz as focusing on the nature of the alleged defamatory communication and the person defamed rather than on the person publishing the defamation. See Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985). The plurality opinion leaves the question open but does not, in our view, constitute an unequivocal retreat from the Gertz analysis. See also 3 Restatement, Torts 2d, § 580A, Comment h, which notes that "there seems no reason" to distinguish between a media and private person speaker in terms of the application of the New York Times/Gertz synthesis nor, indeed, any reason to draw a distinction in this regard between libel and slander. Indeed, Burke v. Deiner, 97 N.J. 465 (1984), has adopted the New York Times standard in non-media publication of matters defamatory to a public official. And see Barbetta Agency, Inc. v. Evening News Pub. Co., 135 N.J. Super. 214, 222 (App.Div. 1975), suggesting as well that application of the New York Times rule depends on the status of the person defamed rather than the alleged defamer.
[8] As explained by Comment c on § 580B at 223,

In Gertz v. Robert Welch, Inc., (1974) 418 U.S. 323 [94 S.Ct. 2997, 41 L.Ed.2d 789], the Supreme Court specifically held that the First Amendment to the Constitution does not permit the imposition of "liability without fault" on "a publisher or broadcaster of defamatory falsehood injurious to a private individual." Aside from this restriction, the Court said, the States may define for themselves "the appropriate standard of liability." The strict liability of the common law has thus expressly been ruled unconstitutional. A significant measure of fault on the part of the defendant in regard to the falsity of the communication is required. Obviously, knowledge of falsity or reckless disregard as to it is sufficient. It is clear also that negligence will likewise meet the constitutional requirement, though a lesser degree of fault probably would not. In view of the constrained change from common law strict liability, it is natural to conclude that the revised common law rule of defamation will be that a defendant is liable either for negligence or for some greater fault. On the basis of this reasoning and the state of the authorities in the short time since the Gertz case was decided, this is the position stated in this Section. Some state court decisions, however, have taken a different position, to the effect that if the defamatory communication involves a "matter of public or general interest," the plaintiff must prove knowledge or reckless disregard as to falsity. This rule, extending the rule as to a public official or public figure (see § 580A) and deriving from the plurality opinion in Rosenbloom v. Metromedia, Inc., (1970) 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296, was repudiated by the Gertz case as a requirement of the First Amendment, binding on the states. It can, however, be voluntarily adopted by them and could eventually become the majority state rule.
[9] Of singular pertinence in this regard is Comment h on § 581A at 237, pointing out that while a mistaken belief in the truth of the published matter may not amount to a bar of the cause of action which truth itself constitutes, "an honest belief may have relevance, however, in determining whether the defamer showed the requisite fault in regard to the truth or falsity of the statement." The court's instruction here in this respect was exactly contrary.
[10] We note that there is apparent conceptual overlap, if not confusion, in the use of the New York Times rule to express both a standard of fault and the definition of what has come to be called "constitutional privilege." See, e.g., Lawrence v. Bauer Pub. & Print. Ltd., supra, 89 N.J. at 462. In the public figure context they are equivalent and the fault concept obviates the need to consider privilege and all its ramifications. As explained by the Restatement in Comment e on § 580A at 219-220,

The effect of the Constitution upon a cause of action for defamation may be described in two different ways. One method is to state that the Constitution imposes a limitation on the action so that the plaintiff cannot maintain it unless he shows that his cause of action does not come within the limitation. The other method is to say that the Constitution affords a privilege to the defendant so that he is not liable if he comes within the scope of the privilege and does not exceed or abuse the privilege. Either description is meaningful, but the use of the term, privilege, in this connection can give rise to a misleading impression. For a privilege created by the law to apply, the person who seeks to dispel the seemingly tortious character of his conduct normally has the burden of raising the issue of the privilege and proving the existence of its elements. (See § 10, Comment c; also § 891). This is true, for example, of the common law privileges to an action for defamation, whether they are absolute or conditional. (See § 613, Comment i). It is not true of the "constitutional privilege" of publishing false and defamatory statements regarding a public official or public figure when there is no knowledge of falsity or recklessness regarding truth or falsity. Here it is held that the plaintiff has the burden of alleging and proving that the defendant had knowledge or acted in reckless disregard.
We further note that while the holding in Dairy Stores, Inc., supra, 104 N.J. 125, is expressly premised on the common-law fair-comment privilege, its rationale is also compatible with a fault analysis, namely, the conclusion, akin to that reached in Sisler, that news media comment on issues of compelling public concern is entitled to the benefit of the New York Times fault standard irrespective of whether the aggrieved person is public or private. Such an analysis would be more consistent with the Restatement approach, which eliminated §§ 606 to 610, inclusive. These sections had constituted the Title on fair comment in the first Restatement and were deleted on the principle that "[a] statement of opinion that does not imply a defamatory statement of fact is no longer actionable" under Gertz and hence no privilege is needed. See § 566 at 170. Moreover, it is the further suggestion of the Restatement that any slack in the fair-comment rule left by § 566 (expressions of opinion) is picked up by the fault standards of §§ 580A and 580B. See Restatement, supra, note following § 610 at p. 297. It is therefore clearly as much within state prerogative to prescribe the New York Times fault standard of § 580 to a cause of action based on media publications of the type involved in Dairy Stores as it is to prescribe that standard in any circumstance. See also Kotlikoff v. The Community News, 89 N.J. 62 (1982), relying on the Restatement approach and concluding that the fair-comment privilege has been replaced by the broader protection described in § 566. This is precisely the State choice discussed by Comment c on § 580B. See note 8, supra.
[11] The Restatement text is as follows:

§ 594. Protection of the Publisher's Interest
An occasion makes a publication conditionally privileged if the circumstances induce a correct or reasonable belief that
(a) there is information that affects a sufficiently important interest of the publisher, and
(b) the recipient's knowledge of the defamatory matter will be of service in the lawful protection of the interest.
§ 595. Protection of Interest of Recipient or a Third Person
(1) An occasion makes a publication conditionally privileged if the circumstances induce a correct or reasonable belief that
(a) there is information that affects a sufficiently important interest of the recipient or a third person, and
(b) the recipient is one to whom the publisher is under a legal duty to publish the defamatory matter or is a person to whom its publication is otherwise within the generally accepted standards of decent conduct.
(2) In determining whether a publication is within generally accepted standards of decent conduct it is an important factor that
(a) the publication is made in response to a request rather than volunteered by the publisher or
(b) a family or other relationship exists between the parties. § 596. Common Interest
An occasion makes a publication conditionally privileged if the circumstances lead any one of several persons having a common interest in a particular subject matter correctly or reasonably to believe that there is information that another sharing the common interest is entitled to know.
[12] There are other consequences of per se slander such as the presumption rather than actual proof of damages. See., e.g., Hall v. Heavey, 195 N.J. Super. 590 (App.Div. 1984). The availability of privilege is not one of them. See, e.g., Dijkstra v. Westerink, supra, 168 N.J. Super. at 135-136, holding the privilege available to a defendant who accused the plaintiff of having committed a crime.
[13] See also note 10, supra. For purposes, however, of instructing the jury, we are of the view that greater clarity results from explaining the New York Times rule in terms of loss of the privilege rather than in terms of establishing the cause of action. It should nevertheless be borne in mind that since some fault standard is a necessary element of the cause of action and hence must be pleaded, the New York Times rule, if not pleaded in the complaint, must be pleaded by reply to an answer raising the defense of privilege. Once issue is thus joined, it makes no practical difference if the New York Times rule is considered an element of the cause or a response to the defense. We leave open the question of whether the plaintiff may initially plead a negligent standard of fault where public debate and comment on public issues is not involved in the cause of action.
[14] The weight of the medical testimony was summed up by Manoukian's expert witness Dr. Befeler, who, in response to a question from the court, explained that

That [the operative report] shows the gallbladder. This business about questions as to whether the appendix or the gallbladder is removed is ridiculous. You only have to look at the operative report and we keep talking about it. This is the operative report. I have underlined every place in the operative report where it says either gallbladder or relates to the gallbladder. It says "acute cholecystitis." The preoperative diagnosis is "cholecystitis, cholelithiasis with gangrenous gallbladder." Cholelithiasis means gallstones and with gangrenous gallbladder and then below it it says, "Appendectomy was proceeded with because of the gangrenous appendix and extreme adhesions of the omentum to the gallbladder." Come on. * * * There is no question that the words appendectomy and gangrenous appendix are an absolute error. They don't belong there and they, obviously, weren't done. If you look at the pathology report it says, "Specimen: gallbladder," and it is signed by whatever person sent it down as being the gallbladder. There is no question that the gallbladder was removed. He didn't take out the appendix. He didn't plan to take it out and he didn't take it out and if he did, he did so in error.
Befeler further explained that
Exploration at the time of removal of the acute gallbladder, such as you feel around the rest of the abdomen, is, absolutely, contraindicated because you are transmitting a walled-off infection around the gallbladder everywhere else in the abdomen. You don't want to do that. You stay in the area, remove the gallbladder and you get out as quickly as you can and it is evident from the surgery, which I think took about 50 some odd minutes, that's exactly what he did and that's what he should have done. That's correct.
Befeler finally was of the view that "it was highly unlikely" that H.W.'s ruptured appendix caused her death in the recovery room, particularly since there was no evidence in any of her medical records that at the time of her death she had "overwhelming peritonitis." No medical witness directly contradicted Befeler's testimony.