DARYL FEES, PLAINTIFF-RESPONDENT, v. CHRISTINE TROW,
DEFENDANT-APPELLANT.

Argued November 18, 1985—Decided March 9, 1987.

*James J. Ciancia,* Assistant Attorney General, argued the cause for appellant (*Irwin I. Kimmelman,* former Attorney General of New Jersey, attorney; *Benjamin Clarke,* Deputy Attorney General, on the brief).

*Anthony L. Mezzacca* argued the cause for respondent.

*Linda G. Rosenzweig,* Director, Division of Mental Health Advocacy, argued the cause for *amicus curiae,* New Jersey Department of the Public Advocate (*Alfred A. Slocum,* Acting Public Advocate, attorney).

PER CURIAM.

This is a defamation case. The issue is whether and to what extent an employee of a state facility for the developmentally disabled is protected by a privilege in making a defamatory report of another employee's abuse of an adult resident of the facility. The trial court granted defendant's motion for summary judgment. The Appellate Division, in an unreported opinion, acknowledged that under the circumstances defendant enjoyed a qualified privilege, but nevertheless concluded that there was a fact issue of whether the privilege had been abused. The court below therefore reversed. We granted certification, 101

*N.J.* 267 (1985), to review that determination, and now reverse and reinstate the judgment in favor of defendant.

## I

In June 1981 both plaintiff and defendant were employed as teachers at New Jersey Neuropsychiatric Institute, commonly known as Skillman, a state-operated residential facility for the developmentally disabled, including the mentally retarded. *See N.J.S.A.* 30:6D–3 (definition of developmental disability). (Effective June 29, 1983, the name of the Institute was changed to the North Princeton Developmental Center. See *L.* 1983, *c.* 231, § 2, codified at *N.J.S.A.* 30:4–177.12.)

On June 1, 1981, defendant, Christine Trow, reported to her supervisor, Ron Wybraniec, an incident that she had allegedly witnessed earlier that day. She claimed to have seen plaintiff, Daryl Fees, in an unoccupied office with one of the institution's adult residents, Carol Dutcher. After making an oral report to her supervisor, defendant gave the following written account of the occurrence:

I saw Daryl Fees going up the stairs * * * with Carol Dutcher about four steps behind him saying, "I'll go upstairs with you honey, * * * I'll follow you, honey * * * etc. * * * As I went around the corner of the stairs I heard Daryl Fees talking and Carol giggling.

    *      *      *      *      *      *      *      *

I saw Daryl Fees seated with his legs together and Carol Dutcher sitting on his lap, facing away from me. Daryl Fees['] hand was under the back of Carol's shirt, and almost all the way up her back. His hand was moving. She continued giggling and I heard her say "Don't touch my breasts," after which Daryl said softly, "I love you," etc.

When confronted with these allegations, plaintiff admitted that Carol Dutcher was in his lap as defendant had reported, but he claimed that Carol "caught me off guard pushing me onto a chair then jumped on my lap." Plaintiff denied ever having his hand under the back of Carol's shirt and further denied telling Carol that he loved her.

When interviewed the next day Ms. Dutcher stated, among other things:

1. Plaintiff told her to sit in the chair.
2. "We sat in the chair and he [plaintiff] rubbed my back and we had love and he loves me."
3. "[H]e [plaintiff] rubbed my breasts * * *."
4. Plaintiff kissed and hugged her.

In a second interview Ms. Dutcher related the following relevant information:

I pushed him [plaintiff] into a chair—he took me onto his lap—he spread his legs so I could sit down.

     \*      \*      \*      \*      \*      \*      \*      \*

He was trying to find another room—I pushed him and he sat down—he sat me on his one leg—

     \*      \*      \*      \*      \*      \*      \*      \*

He took his hands on my breasts and put his hands under my dress on the front and he kissed my breasts.

Further investigation led to an interview of another resident, Pat Murray, who stated that on another occasion he had observed plaintiff in the coffee room with Ms. Dutcher, and that plaintiff had his right hand on Ms. Dutcher's breast. Following this investigation plaintiff was terminated from his unclassified position as Teacher II. Thereafter plaintiff requested and received a conference with his department head, which resulted in the affirmance of his termination.

About a year-and-a-half after being terminated plaintiff started this suit by filing a complaint in which he alleged that "defendant, Christine Trow, falsely accused the plaintiff of caressing the breasts and kissing Carol Dutcher" (an accusation we note, that was not included in defendant's report); that defendant knew the statements made by her were false and that she made them "without justification or cause and * * * maliciously;" and that plaintiff's reputation had been damaged, his good name injured, and he had been "brought into public scandal, infamy and disgrace and * * * caused to lose his job as a result." In due course defendant moved for summary judgment on the ground that defendant's report was privileged as a matter of law.

In opposition to the motion plaintiff filed a certification in which he stated:

> Although Carol Dutcher did jumpt [sic] into my lap, I never put my hand under the back of her shirt and up her back as the defendant falsely stated to her superiors. Also, I never told Carol Dutcher "I love you." In addition, I do not recall Carol Dutcher stating "Don't touch my breasts," as supposedly heard by the defendant.
>
> In addition, I have reason to believe that the defendant wanted to instigate trouble for me. Approximately one week prior to the incident in question, while the defendant and I were in the supervisor Ron Wyberonniec's [sic] office, I remarked to her that she should not be taking so many Digel pills. The defendant became very indignant and angry with me.

■ Pursuant to Rule 1:6–2(d) the trial court decided the motion on the papers, without oral argument. The order granting summary judgment for defendant recites that the statements on which the defamation action was based were "privileged." (We note in passing that because suit was not started until twenty months after defendant made her report, there appears to be an obvious statute-of-limitations defense under *N.J.S.A.* 2A:14–3, which requires that "[e]very action at law for libel or slander * * * be commenced within 1 year next after publication of the alleged libel or slander"; but because that affirmative defense was neither pleaded in defendant's answer nor raised in defendant's motion for summary judgment, and because it has not been adverted to by either party at any stage of these proceedings, we treat it as having been waived. *See R.* 4:6–7; *Rappeport v. Flitcroft,* 90 *N.J.Super.* 578, 581 (App.Div. 1966)).

In reversing the summary judgment for defendant the Appellate Division acknowledged this Court's observation in *Kotlikoff v. The Community News,* 89 *N.J.* 62, 67–68 (1982), that defamation actions are particularly well-suited to the summary judgment procedure, and recognized as well that "a qualified privilege protects a public employee such as defendant in matters of this sort * * *." The court below concluded, however, that plaintiff's certification in opposition to the motion for summary judgment contained averments from which the trier of the facts could reasonably conclude that the privilege had

been abused. The Appellate Division emphasized "[d]efendant's alleged knowledge of the untruthfulness of the statement and her malicious purpose in communicating it to plaintiff's superiors * * *."

## II

Our law of defamation is grounded on the principle that people should be free "to enjoy their reputations unimpaired by false and defamatory attacks." *Swede v. Passaic Daily News*, 30 *N.J.* 320, 321 (1959). In certain situations, however, the public interest presents the "vital counter policy" that persons should be permitted to communicate without fear of a defamation action. *Ibid.* The tension between these competing interests—the encouraging of the free flow of information about matters of public concern, and the protection of reputation—is reflected in the evolution of the law of defamation. *See Sisler v. Gannett Co., Inc.*, 104 *N.J.* 256, 262 (1986) (referring to "the unhappy cohabitation of the tort of defamation, which is protective of an individual's reputation, with constitutional guarantees that serve to protect free speech and press"); *Dairy Stores, Inc. v. Sentinel Publishing Co.*, 104 *N.J.* 125, 135–36 (1986). The law of privilege is designed to protect speech in those narrowly defined instances in which the public interest in unrestrained communication outweighs the right of redress.

Because the balance between these countervailing principles must be carefully drawn, a privilege may be either absolute or qualified. An absolute privilege confers complete immunity on otherwise defamatory statements. *See Dairy Stores, Inc. v. Sentinel Publishing Co., supra*, 104 *N.J.* at 136. It affords complete protection: "by reason of the occasion on which it is made, no remedy is provided for the damages in a civil action for slander or libel." *Rogozinski v. Airstream by Angell*, 152 *N.J.Super.* 133, 149 (Law Div.) (quoting 53 C.J.S. *Libel and Slander* § 88 (1948)), modified, 164 *N.J.Super.* 465

(App.Div.1977). Because an absolute privilege protects even a maliciously-spoken untruth, it is provided only in the narrowest of instances, where the public interest in unfettered communication justifies the complete abrogation of the plaintiff's right of recovery for damaged reputation. *Rogozinski v. Airstream by Angell, supra,* 152 *N.J.Super.* 133 (class of occasions in which publication of defamatory matters is absolutely privileged is confined within narrow limits, and courts as a rule have steadily refused to enlarge those limits); *see also Devlin v. Greiner,* 147 *N.J.Super.* 446, 456 (1977) (court will not lightly extend absolute privilege to new situations unless policy on which privilege is based is found to exist). Absolute immunity, for example, has been reserved for statements during judicial proceedings and quasi-judicial administrative proceedings, *J.D. Constr. Corp. v. Isaacs,* 51 *N.J.* 263 (1968), as well as statements made in the legislature. *N.J. Const.* of 1947 art. IV, § 4, para. 9; *Cole v. Richards,* 108 *N.J.L.* 356, 357 (E. & A. 1932); F. Harper & F. James, *The Law of Torts* § 5.23 (2d ed. 1986). Official acts of the State as well as executive officers of the State have also been clothed with an absolute immunity. *See Burke v. Deiner,* 97 *N.J.* 465 (1984) (concluding that immunity varies in proportion to nature of official functions and range of decision-making discretion, and according qualified privilege to commissioners of municipal parking authority); *In the Matter of the Hearing on Immunity for Ethics Complaints,* 96 *N.J.* 669, 671 (1984) (upholding validity of Rule 1:20–11(b), which provides that a grievant in ethics matter or client in fee arbitration claim shall be absolutely immune from libel suit for testimony made in connection with ethics proceedings).

■ A conditional or qualified privilege, on the other hand, is designed to advance the important public interest in unrestrained speech while retaining a measure of protection for the plaintiff who is maliciously defamed.

The policy is an accommodation of competing social and political interests for the good of all: the protection of the reputation of individuals, on the one hand, and on the other the collective security and the "interest of the public in the

fullest freedom of officials to make disclosures on matters within the scope of their public duties * * *."
[*Coleman v. Newark Morning Ledger Co.*, 29 *N.J.* 357, 376 (1959), (quoting *Barr v. Matteo*, 355 *U.S.* 171, 78 *S.Ct.* 204, 2 *L.Ed.*2d 179 (1957)).]

The purpose of the qualified privilege, then, is to give to the person who utters defamatory words that are in fact untrue protection from legal liability for that defamation if those words are uttered in furtherance of the policy that the qualified privilege is designed to accommodate. The privilege may be lost, however, unless the information is provided to one with a "corresponding interest" in the information, *Coleman, supra*, 29 *N.J.* at 375.

■ Our objective in this case is to fashion a privilege that insures that reports of abuse of residents of this state's facilities for the developmentally disabled are not deterred by fear of a defamation action. As the brief of *amicus*, New Jersey Department of the Public Advocate, so graphically demonstrates, this case illuminates an area that has but recently come to be recognized as one in which principled employees should not be deterred from reporting abuse by the prospect of an action for libel or slander. No longer can it be questioned—if ever it could—that the public policy of New Jersey favors protecting the mentally ill and developmentally disabled from abuse or mistreatment, to which they are particularly vulnerable, often being without the knowledge, ability, or resources to protect or vindicate their civil rights. Federal law, in the form of the Civil Rights of Institutionalized Persons Act, 42 *U.S.C.* § 1997 et seq., and the Developmental Disabilities Assistance and Bill of Rights Act, 42 *U.S.C.* §§ 6000 to 6081, finds its parallel in state legislation designed to protect the institutionalized from harm. See, *e.g.*, the so-called Patients' Bill of Rights Act, *N.J.S.A.* 30:4-23 to -25.7, and the Developmentally Disabled Rights Act, *N.J.S.A.* 30:6D-1 to -32.

■ Important as the foregoing policies are, we are satisfied that their vindication does not require our expanding the carefully limited horizons of an absolute privilege. As we recently

observed, "a qualified or conditional privilege has emerged as one of the prime means for the common law to balance the interests in reputation with the publication of information in the public interest." *Dairy Stores, supra,* 104 *N.J.* at 137. Moreover, we harbor no doubt whatsoever that the public interest, self-evident moral considerations, and the nature of her employment would require that one in the position of defendant report to her supervisor any incident of patient abuse. *Cf. Bainhauer v. Manoukian,* 215 *N.J.Super.* 9, 38 (App.Div.1987) (hospital staff physicians have, "at the least, a moral duty" to "express themselves openly and without fear of reprisal when matters directly affecting the quality of health care are involved.").

We deem it significant that to the extent that the legislature has addressed the reporting of abuse of some of this state's most vulnerable citizens—the institutionalized elderly and residents of health care facilities—it has cloaked those who work with that population with a qualified or conditional privilege.

> Any person who reports suspected abuse or exploitation pursuant to this act or who testifies in any administrative or judicial proceeding arising from such report or testimony shall have immunity from any civil or criminal liability on account of such report or testimony, unless such person has acted in bad faith or with malicious purpose.
>
> [*N.J.S.A.* 52:27G–7.1e (West Supp.1985) (Report of suspected abuse or exploitation of institutionalized elderly persons) and *N.J.S.A.* 30:1A–3e (West Supp. 1979) (Suspicion of abuse or exploitation of resident of health care facility).]

That the foregoing statutory provisions do not embrace the residents of state-operated institutions for the developmentally disabled, such as Skillman, should not, we believe, be taken to mean that the legislature would have us grant to those who work with the institutionalized developmentally disabled population some different form of protection or privilege. We therefore conclude, as did the Appellate Division, that defendant was entitled to a qualified immunity in any civil or criminal proceedings arising from her report of plaintiff's activities with Ms. Dutcher.

## III

Having established that a qualified privilege is the appropriate measure of protection in this case, we turn next to the question of what constitutes an abuse of that privilege. Our inquiry looks to what must be shown by plaintiff to overcome defendant's immunity from a defamation action arising out of her qualifiedly privileged communication, made in the setting of an area of grave public concern.

In approaching that inquiry we are mindful of our recent commitment, as a general proposition in defamation cases pertaining to matters of public concern, to the "actual malice" test derived from *New York Times v. Sullivan*, 376 *U.S.* 254, 84 *S.Ct.* 710, 11 *L.Ed.*2d 686 (1964), namely, defamation made "with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 279–80, 84 *S.Ct.* at 726, 11 *L.Ed.*2d at 706. *See, e.g., Sisler v. Gannett Co., Inc., supra,* 104 *N.J.* at 266; *Dairy Stores, supra,* 104 *N.J.* at 148–53; *Burke v. Deiner, supra,* 97 *N.J.* at 475. This case is readily distinguishable, of course, from the foregoing decisions and others of that ilk inasmuch as it involves (a) a non-medium defendant (we declared the public official defendants in *Burke* to be the "functional equivalen[t]" of the media, 97 *N.J.* at 475), and (b) speech in compliance with a legal and moral duty rather than "official" speech or speech consequent on administrative or news-reporting discretion. Those distinguishing features would ordinarily be of no moment, however, given our unqualified declaration in *Dairy Stores, supra,* that "the actual malice standard should apply to non-media as well as media defendants." 104 *N.J.* at 153. We would therefore apply the "actual malice" test here but for what we perceive to be the legislature's clear signal of the direction we should take in this and like cases, where the duty to speak is born of the responsibility for caring for our disabled population. We look to the statutes.

Just as the statutory provision applicable to those who report abuse of the institutionalized elderly, *N.J.S.A.* 52:27G–7.1e, and

of residents of health care facilities, *N.J.S.A.* 30:1A-3, quoted above at 339-340, forms the basis for our conclusion that those who are charged with the awesome responsibility of caring for the institutionalized developmentally disabled likewise should be shielded by a qualified privilege, so too are we persuaded that the nature and extent of the privilege accorded this defendant should again mirror the cited statutes, *i.e.*, "immunity from any civil or criminal liability on account of such report" unless the person making the report "acted in bad faith or with malicious purpose." We can perceive of no basis in policy or law for a variation in the kind and extent of privilege to be applied. We are persuaded that the legislature has given clear evidence of its intention to have us apply to "whistle blowers" in the context of this case an "ill motive" standard, the equivalent of the statutory "bad faith or malicious purpose" test.

We equate those statutory concepts with the "wrong or malicious motive" declared in *Coleman v. Newark Morning Ledger Co., supra,* 29 *N.J.* at 373, to be essential before a privileged communication is rendered actionable. Under *Coleman* the inquiry is directed to the primary motive or intent of the defendant:

> "[T]he court will look to the primary motive or purpose by which the defendant apparently is inspired"; it would seem that "the privilege is lost if the publication is not made primarily for the purpose of furthering the interest which is entitled to protection"; if the defendant is moved "chiefly" by "motives of ill will, or to accomplish a distinct objective which may be legitimate in itself but is not within the privilege," * * * he is given no immunity. [*Id.* at 375 (quoting W. Prosser, *Law of Torts* 601, 627-28 (2d ed. 1955)).]

Therefore, in the present context we observe the principle that "a wrong or malicious motive is essential to the action where the communication is privileged." *Id.* at 373 (quoting *King v. Patterson,* 49 *N.J.L.* 417, 419 (E. & A. 1887)). The appropriate measure of abuse of the privilege in a case such as this is whether the defendant is moved primarily by ill will.

Finally, we derive comfort from our conviction that if indeed we have misgauged the legislature's intent, that body can easily rectify the result of our misperception. Nor will our

application of the "wrong" test, if such it be, in this case produce any injustice to this plaintiff, for as we shall see hereafter in comparing defendant's version of the events with plaintiff's evidence that the defendant had neither knowledge nor awareness of a high degree of probable falsity will almost inevitably coalesce with a finding of no ill will.

## IV

Without directly stating as much, the Appellate Division apparently accepted the form of qualified privilege that we hold is applicable in this case. It referred to defendant's alleged "malicious purpose" and her "motives"—ingredients of *Coleman*'s "ill-motive" standard rather than of "actual" or *New York Times* malice. But the court below teased out a fact issue from plaintiff's certification in opposition to defendant's summary judgment motion, and hence remanded the cause for trial.

The part of plaintiff's certification that the Appellate Division found significant was his assertion that his admonition to defendant, about a week before the Dutcher incident, that "she should not be taking so many Digel pills" made her "very indignant" and "angry with [plaintiff]." See *supra* at 335.

Our inquiry under *Coleman* is twofold: whether defendant made her report to someone with a "corresponding interest" in the information—obviously her report to her superior meets that requirement—and whether defendant was motivated "primarily" or "chiefly" by ill will. 29 *N.J.* at 375; *see also Sokolay v. Edlin*, 65 *N.J.Super.* 112, 127 (App.Div.1961) ("The primary motive or purpose is dispositive. Thus the existence of ill will, etc., will not defeat the privilege unless it is the primary motivating force."). Because a qualified privilege is favored with a presumption that there was no express malice, plaintiff carries the burden of establishing that the statements complained of were made "from an indirect or improper motive, and not for a reason which would otherwise render them privileged." *Ibid.*, citing *Coleman, supra*, 29 *N.J.* at 373. We conclude that plaintiff's

certification, read in its most favorable light, does not create an issue of fact sufficient to permit a conclusion that the above-stated burden was met.

■ Recall that plaintiff admits the essential features of defendant's report: that he was alone in an upstairs office with Ms. Dutcher seated on his lap, facts confirmed by the patient, who substantially supported as well the substance of Ms. Trow's version. To the extent that defendant's statement diverges from plaintiff's version, we do not detect a difference so sharp as to permit an inference that defendant contrived the story primarily to harm plaintiff.

■ Nor do we perceive that plaintiff's allegation that his "Digel pills" remark caused defendant to become "very indignant and angry" with him directly advances the proposition that defendant acted in bad faith. We are asked to infer from that incident—assuming, as we must, that it occurred—that defendant exhibited some ill will towards plaintiff one week before the report, that she harbored these feelings for a week, and that she then relayed the information in her report with the primary purpose of harming plaintiff. There is nothing to suggest that defendant's reaction to the supposed slight was so emotional or excessive as to indicate that she might act in furtherance of a hostile motive. Disagreements between co-workers over the course of a working relationship are not uncommon. Feelings of anger and irritation aroused in everyday conversation need not—and presumably most often do not—result in actions designed to visit harm on the source of that anger.

We deal here with questions of degree that turn essentially on notions of practicality and common sense. We can offer no set formula to guide trial courts on what amounts to a question of fact in the context of cases such as this one, regarding the primary motive of a defendant. We can say with certainty, however, that an isolated instance, as here, of "anger and indignation" exhibited by defendant in an earlier conversation with the plaintiff is insufficient to call into question defendant's primary motive in reporting to her supervisor plaintiff's alleged

abuse of a state mental patient. The best that can be made of plaintiff's certification is that it rises to the level of a mere scintilla of evidence; and we continue to honor the proposition that " '[w]here the case is * * * one of qualified privilege, and there is * * * not more than a scintilla of evidence[ ] of malice, it is the duty of the trial judge to withdraw that issue from consideration of the jury.' " *Jorgensen v. Pennsylvania R.R. Co.,* 25 *N.J.* 541, 569 (1958) (quoting *Murphy v. Johns-Manville Prods. Corp.,* 45 *N.J.Super.* 478, 485 (App.Div.1957).

## V

The judgment of the Appellate Division is reversed. The cause is remanded to the Law Division for entry there of judgment for defendant.

*For reversal and remandment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—none.