245 N.J. Super. 480 (1991)
586 A.2d 278
FRANKLIN D. LUTZ, PLAINTIFF-APPELLANT,
v.
ROYAL INSURANCE COMPANY OF AMERICA; LINDA E. CARY, INDIVIDUALLY AND IN HER CAPACITY AS REGIONAL MANAGER OF ROYAL INSURANCE COMPANY; W.P. BUCKLEMAN, INDIVIDUALLY AND IN HIS CAPACITY AS PROCESSING CENTER MANAGER FOR ROYAL INSURANCE COMPANY; AND DONNA POE, INDIVIDUALLY AND IN HER CAPACITY AS AN EMPLOYEE AND AGENT OF ROYAL INSURANCE COMPANY, DEFENDANTS-RESPONDENTS, AND CLARENCE LOFBERG, INC., A NEW JERSEY CORPORATION; RICHARD LOFBERG, INDIVIDUALLY AND IN HIS CAPACITY AS CHIEF EXECUTIVE OFFICER OF CLARENCE LOFBERG, INC.; PAUL LOFBERG, INDIVIDUALLY AND IN HIS CAPACITY AS PRESIDENT OF CLARENCE LOFBERG, INC., DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued October 16, 1990.
Decided January 23, 1991.
*484 Before Judges O'BRIEN, SCALERA and KEEFE.
Mark Diana argued the cause for the appellant (Shanley & Fisher, attorneys; Patrick M. Stanton and Mark Diana, on the brief).
Walter E. Monaghan argued the cause for the respondent, Royal Insurance Company of America, Linda E. Cary, Individually, W.P. Buckleman, Individually and Donna Poe, Individually (Haggerty, Donohue & Monaghan, attorneys; Walter E. Monaghan, on the brief).
The opinion of the court was delivered by KEEFE, J.A.D.
*485 Plaintiff Franklin D. Lutz appeals from the entry of summary judgment dismissing his complaint for defamation and tortious interference resulting from the Law Division judge's determination that the communications of which plaintiff complained were non-actionable "pure" opinions and that plaintiff failed to present sufficient evidence of defendants' malice with respect to his claim of interference with contractual relations. We affirm in part and reverse in part for the following reasons.
The parties are essentially in agreement as to many of the facts in this matter. They dispute, however, the content and context of certain statements alleged to have been made by plaintiff, and the motivation of defendants Linda E. Cary, W.P. Buckleman and Donna Poe, employees of defendant Royal Insurance Company of America, for disclosing plaintiff's alleged statements to his employer, Clarence Lofberg, Inc. (Lofberg, Inc.), who terminated plaintiff's employment because of plaintiff's alleged conduct.[1]
Lofberg, Inc. is an insurance agency. Richard Lofberg serves as chief executive officer, and Paul Lofberg, his brother, serves as president. Plaintiff was hired by Lofberg, Inc. in May 1969 and was ultimately promoted to executive vice president and supervisor of the personal lines department, a position he held at the time of the events which form the basis for his complaint. He was also responsible for maintaining proper relationships with the insurance companies with whom Lofberg, Inc. placed its personal lines and for soliciting and obtaining new personal lines business.
Royal Insurance Company of America (Royal) is an insurance company with whom Lofberg, Inc. placed much of its insurance business. Lofberg, Inc. had been an agent for Royal for over 40 years. In 1984, Royal designated Lofberg, Inc. a "Royalty Agent," which meant that Lofberg, Inc. was given the special *486 privilege of acting as its own underwriter with respect to certain kinds of policies. The designation of Royalty Agent was a great honor, and it represented a high degree of trust which Royal had in an agent receiving the designation. In return for having been granted Royalty Agent status, Lofberg, Inc. was expected to meet higher sales quotas. As the supervisor of the personal lines department at Lofberg, Inc., plaintiff was given underwriting authority under the Royalty Agent agreement on behalf of Royal.
In July, 1986 Royal instituted a new program on its computers entitled "PULSE," which was being installed by Royal for inputting data directly from agencies to Royal. Defendant Donna Poe, employed at the Royal office in Virginia, was the Royal employee who was sent to Lofberg, Inc. to train its personnel over a three-day period on the use of the new system.
Poe arrived at the Lofberg office on July 14, 1986 and was introduced to plaintiff and Marie Lendino. She spent some time with them in going over the "PULSE" manual. When it came time to access the computer, however, she encountered many problems with the Royal computer system. Poe's account of what transpired thereafter, placed in a written report to her superior, defendant Buckleman, follows.
During the period when Poe was attempting to solve the computer problems, plaintiff, according to Poe, "constantly complained of Royal's inadequate service." He told Poe that he did not plan on writing any more business through Royal than was necessary to meet the requirements for maintaining Royalty Agent status and that he preferred placing his business with Great American Insurance Company, stating that "Royal sucks" and "Great American is my baby."
During Poe's second day at Lofberg, Inc., the problems with the computer system continued, and she was never able to access the system. In the morning hours, plaintiff "constantly made sexist remarks" and "spoke of women from tennis camp," from which he had just returned after being on vacation. *487 Plaintiff continued to complain about Royal, and at one point, when he noticed that the Lofberg agency name had been spelled incorrectly on the training manual, stated that "stupidity must be a qualification for working at Royal."
Plaintiff's remarks and "smart comments" upset Poe and had her "in tears." At some point during that morning, Lendino told Poe "not to let [plaintiff] get to [her]," and that plaintiff "was always that way. You just have to ignore him, just tune him out."
On July 16, the third day of the training session, plaintiff and Lendino met Poe at Royal's East Hanover office to use that office's computers in connection with Poe's continued training of plaintiff and Lendino. The "entire time" that Poe was attempting to teach Lendino the system, plaintiff told Poe to "shut up," apparently because plaintiff wanted Lendino to learn the system by herself without Poe's help since Poe would not be available to answer questions when Lendino was actually doing work at Lofberg, Inc. Further, whenever Poe tried to show or tell Lendino how to proceed, plaintiff told Poe that Lendino "didn't need to know that," and, at one point, even Lendino asked plaintiff to be quiet so she could learn what Poe had to teach.
Thereafter, plaintiff, Lendino and Poe went to lunch. During lunch, plaintiff "got on the subject of women [and] sex," and at one point said: "Women have it made during sex. All they have to do is lie on their back [sic] and enjoy themselves." At this point Lendino responded by "rolling her eyes," and Poe responded that plaintiff "had obviously been with immature women." Plaintiff then asked Poe "are you saying that you are a mature woman?" Poe did not respond. When the three returned to the East Hanover office after lunch, plaintiff "used the word F____ a couple of times in general conversation." Thereafter, plaintiff unfavorably "compared" Royal to Great American numerous times.
*488 When Poe returned to her Richmond office, she met with her supervisor, and defendant Buckleman, the processing center manager of the Richmond office. After hearing Poe describe her experiences with plaintiff, Buckleman asked Poe to submit a written statement of the events. The preceding quotes were taken from Poe's handwritten statement.
After receiving Poe's written statement, Buckleman wrote to A.R. Accorti, the territorial vice president of Royal in the Philadelphia area, and informed him of Poe's experiences with plaintiff. In his letter, Buckleman quoted portions of Poe's written statement regarding the comments plaintiff made to Poe. Buckleman stated that while Poe was in the company of plaintiff he was "abusive, vulgar and offensive." Buckleman also stated that Poe did not want to return to Lofberg, Inc. if plaintiff was going to be there and questioned Accorti as to how "[plaintiff could] get off with his behavior?" Buckleman also stated that plaintiff's behavior appeared to be "routine" given the advice Poe received from "women in the Lofberg office." He closed by saying that although he did not "know what can be done about [plaintiff's] behavior," he thought Accorti "should be aware of this problem."
When Accorti received Buckleman's letter, he forwarded it to defendant Cary, the Royal regional manager, who determined that the appropriate response under the circumstances would be to terminate Lofberg, Inc.'s underwriting responsibilities for both personal and commercial lines, thereby revoking Lofberg, Inc.'s Royalty Agent status. As a result, on August 7, 1986 Cary wrote to Richard Lofberg and terminated the Royalty Agent agreement. Cary enclosed a copy of Buckleman's letter to Accorti with her letter, saying that the "behavioral situation which is described in the attached letter is beyond anything which I would ever comprehend occurring in my region and especially as respects a Royalty Agency relationship." She concurred with Buckleman's description of plaintiff's behavior as "abusive, vulgar and offensive," and stated that the situation required that Lofberg, Inc. apologize to Poe, Buckleman *489 and Accorti. After discussing the significance of the Royalty Agent relationship and noting that "normally acceptable business practices and personal manners were so flagrantly abused," Cary stated that "the behavior of [plaintiff] not only does not epitomize the position of a Royalty Agent, it does not epitomize civilized human behavior." Accordingly, Cary told Lofberg that as of September 1, 1986 the Royalty Agent agreement was no longer in effect, and while Royal would "continue to service [Lofberg, Inc.'s] business with the utmost of professionalism," it wanted to deal with someone besides plaintiff in connection with "all future personal lines matters."
Immediately after receiving the Cary letter, Richard and Paul Lofberg decided to terminate plaintiff. Although the Lofbergs made no investigation as to the truth of the allegations in Cary's letter, they believed that the allegations were true. The Lofbergs had previously noted that plaintiff "was beginning more and more frequently to talk with various female employees on the staff in a manner that indicated some sexual overtones or sexual crudity." Plaintiff had been using "four letter words" around the office, other Lofberg employees had complained about plaintiff's "vulgar and crude" comments. Plaintiff had become "overbearing" and "arrogant" and was not performing his work.
Moreover, several years before, the Lofbergs had discussed with plaintiff what they viewed as a "drinking problem." Thereafter, for a short time, plaintiff controlled his drinking, but after approximately three months, the Lofbergs noticed that plaintiff's drinking had begun to affect his work again. The Lofbergs planned to once again talk with plaintiff about his drinking when they were contacted by Cary, who complained that Royal was having trouble working with plaintiff because of his drinking problem. Cary and Richard Lofberg agreed that plaintiff could not continue acting as a Royalty Agent in that state. Cary suggested that Lofberg allow her to discuss the matter with plaintiff because a close relative had been an alcoholic, and she believed she could help plaintiff.
*490 Plaintiff met Cary at a rest area on the New Jersey Turnpike sometime during the spring of 1985. She told plaintiff about her father's drinking problem and how Alcoholics Anonymous had helped him. Cary also related information to plaintiff which she had received from people in the Royal office in Philadelphia who had previously spent several days training plaintiff, to the effect that they had observed him with "liquor on his breath" throughout the course of the training. During this meeting, Cary told plaintiff that if he did not "try Alcoholics Anonymous and [] take care of his drinking problem," she "had no alternative but to go to the Lofbergs and tell them that this was a problem, [that] this is what transpired in Philadelphia and it didn't seem that we could continue to have this [Royalty Agent] responsibility with [plaintiff]."
Having experienced all of these problems with plaintiff's drinking and poor performance prior to receiving the Cary letter in August 1986, the Lofbergs believed the circumstances described in the Buckleman and Cary letters, and they felt that plaintiff had damaged their reputation. Richard Lofberg did not interpret Cary's letter as Cary's wanting Lofberg, Inc. to fire plaintiff, but that Cary did not want plaintiff handling Royal matters in the future. However, Lofberg stated that had it not been for Cary's letter, he would not have terminated plaintiff when he did in August 1986.
Plaintiff's version of the events leading up to his termination is substantially different. When Poe arrived at Lofberg, Inc. on July 14, 1986 plaintiff informed her that they had experienced problems with the computer interface between Lofberg, Inc. and Royal and that the computer line had not been working for approximately six weeks. At one point on July 14, while Poe was at Lofberg, Inc., plaintiff noticed that a number of Lofberg employees not involved in the training were "congregating near where [Poe] and [Lendino] were trying to conduct the training," and he "jokingly commented that it was nice to see that they were out of work and were willing to help the Automobile Department," in which Lendino worked. When *491 plaintiff made that comment, Poe "smiled and said, `How can you stand him?' The others laughed and one said, `we're used to it. We just ignore him.'" Because the other employees laughed and went back to work, plaintiff "said nothing further."
Plaintiff denied using any "abusive, vulgar or offensive language" toward Poe or anyone else, and denied making any comments to Poe which could be described as "consistently sexist." He denied saying "Royal Insurance sucks," "Royal can't do anything right," or that Royal was "pitiful" in contrast to "Great American."
On July 16, 1986 Lendino and plaintiff met Poe at the East Hanover Royal office pursuant to Poe's suggestion of the previous morning. Plaintiff told Poe that he was concerned that she should not "immediately" tell Lendino what to do whenever Lendino hesitated at the computer keyboard, because he wanted Lendino to learn from her mistakes and "try to figure out for [herself] what" she did wrong. This was based upon plaintiff's past experiences which had taught him that unless the trainer allows the trainee to make her own mistakes and attempt to correct them herself, the trainee does not learn. Plaintiff told Poe that if Poe started to give Lendino instructions without allowing Lendino to try to work things out herself, he would tell Poe to "shut up," to which Poe had no objection.
At lunchtime, Poe suggested that the three of them go out somewhere for lunch, and so they went to a local restaurant which Poe suggested. Because it happened to be plaintiff's fiftieth birthday, Lendino, who was also in her fifties and whom plaintiff had known for many years, offered a toast to plaintiff and said: "Happy Birthday, you better watch out, you are getting older, you don't have much time left." Plaintiff laughed at her comment and responded that "women have it easier than men, they can just relax and enjoy it." Plaintiff's comment was directed at Lendino, not Poe, and referred to past *492 conversations which Lendino and plaintiff had had "about women being able to enjoy sex once they were past the point of worrying about pregnancy." Plaintiff, Lendino and Poe all laughed at plaintiff's comment.
Plaintiff's account of his 1985 meeting with Cary on the New Jersey Turnpike also differed from Cary's account. When plaintiff met her, she told him she thought he had a "real drinking problem," and that she wanted to talk to him because both her brother and father were alcoholics. Cary told plaintiff that if he did not join Alcoholics Anonymous she would have him fired. When plaintiff denied having a drinking problem, Cary told him to "think about it," because if he didn't join Alcoholics Anonymous, she was going to tell the Lofbergs. Plaintiff agreed to join Alcoholics Anonymous only because he was afraid of losing his job. When he returned to his office, he told Paul Lofberg that he planned to join Alcoholics Anonymous, which he then did.

I
The threshold issue in every defamation action is whether the language in question is reasonably susceptible of a defamatory meaning. Romaine v. Kallinger, 109 N.J. 282, 290, 537 A.2d 284 (1988). A defamatory meaning will be found only if the language asserts or implies a statement of fact which is damaging to reputation. Kotlikoff v. The Community News, 89 N.J. 62, 68-70, 444 A.2d 1086 (1982). Liability may be imposed only if the statement of fact is shown to be false. Id. A false statement is defamatory if it exposes a person to hatred, contempt or ridicule, or subjects him to a loss of good will and confidence of others, or so harms his reputation as to deter others from associating with him. Romaine v. Kallinger, supra, 109 N.J. at 289, 537 A.2d 284, citing Prosser and Keeton on the Law of Torts § 111 at 775 (5th ed. 1984). A statement made in the context of and pertaining to a person's trade, profession or business, such as in this case, is actionable *493 if the statement is made with reference to "a matter of significance and importance" relating to the manner in which the subject of the statement carries out his trade, profession or business. Prosser and Keeton, Law of Torts, Id. § 112 at 791. Whether a statement is susceptible of a defamatory meaning is to be initially made by the court. Romaine, supra, 109 N.J. at 290, 537 A.2d 284.
Although the Law Division judge did not expressly address whether defendants' statements were susceptible of a defamatory meaning, in our view the statements when viewed as a whole were susceptible of such meaning. For example, the classification of plaintiff as "abusive, vulgar and offensive," the statement that his behavior did not "epitomize civilized human behavior", the implication that he was sexist in his relations with fellow workers, that he was disloyal to his principal (Royal) and that he was disruptive of his principal's choice of training techniques imply certain facts which could tend to harm plaintiff's reputation or "deter [others] from associating or dealing with him." Romaine, supra, 109 N.J. at 289, 537 A.2d 284. Evidently those statements did deter Lofberg, Inc. from associating with plaintiff, because he was fired based on those statements.
In his written opinion granting summary judgment, the Law Division judge concluded that "as all of the defendant's [sic] statements can only be construed as opinion, they are non-actionable." The judge determined that, in New Jersey, statements of "pure" opinion are not actionable where the maker of the statement discloses the facts upon which the opinion is based. The judge then stated that "[t]his is the situation here."[2]
*494 At least as respects matters of public interest, only a statement of fact can be defamatory; mere expressions of opinion, which can never be "true" or "false," are not actionable. Kotlikoff, supra, 89 N.J. at 69, 444 A.2d 1086. However, plaintiff claims that the Kotlikoff rule, upon which the Law Division judge relied, does not apply here, because the defamatory statements were made between private persons regarding private matters. The judge's opinion did not address the public concern/private concern dichotomy. In order to resolve this question, a review of Kotlikoff and the cases which were decided prior and subsequent to it is warranted.
In Kotlikoff, the Court held that under the United States Supreme Court's opinion in Gertz v. Welch, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the common-law "fair comment" privilege had "been replaced by a broader protection." Kotlikoff, supra, 89 N.J. at 68-69, 444 A.2d 1086. That "broader protection" was articulated as a complete privilege for expressions of "`pure' opinion on matters of public concern." Id. at 69, 444 A.2d 1086. "Pure opinion" was defined as opinion where the "maker of the comment does not spell out the alleged facts on which the opinion is based but both parties to the communication know the facts or assume their existence and the statement of opinion is obviously based on those assumed facts as justification for the opinion." Id. Where a statement is an opinion in form or context but is "based on facts about the plaintiff or his conduct that have neither been stated by the defendant nor assumed to exist by the parties to the communication", the statement is actionable if it implies the allegation of undisclosed defamatory facts as the basis of the opinion. Id. The Kotlikoff decision was expressly based upon the following language in the Gertz decision:
Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact.
*495 Kotlikoff, supra, 89 N.J. at 68, 444 A.2d 1086, citing Gertz, supra, 418 U.S. at 339-340, 94 S.Ct. at 3006-3007, 41 L.Ed.2d at 805.[3] However, the Kotlikoff Court expressly reserved decision as to "whether the Gertz protection would extend also to opinions on private matters contained in private communications." Id. 89 N.J. at 69 n. 3, 444 A.2d 1086.
Subsequent to Kotlikoff, the United States Supreme Court considered whether the Gertz principles should apply to private matters in Dun & Bradstreet v. Green Moss Builders, 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985). In Dun & Bradstreet, a construction contractor sued a credit reporting agency for defamation when the credit reporting agency falsely reported that the contractor had filed for bankruptcy. 472 U.S. at 751, 105 S.Ct. at 2941. A jury returned a verdict for the contractor, and the Vermont Supreme Court reversed on the basis of Gertz. Id. at 752, 105 S.Ct. at 2941. The United States Supreme Court declared that in cases involving private matters the "role of the Constitution in regulating state libel law is far more limited [than in matters such as those presented by] Gertz," because "[i]n such a case, `[t]here is no threat to the free and robust debate of public issues; there is no potential interference with a meaningful dialogue of ideas concerning self-government; and there is no threat of liability causing a reaction of self-censorship by the press.'" Id. at 759-760, 105 S.Ct. at 2945 (citing Harley-Davidson Motorsports, Inc. v. Markley, 279 Or. 361, 568 P.2d 1359, 1363 (1977)). As a result, the Court declined to extend the principles of Gertz where "no matters of public concern" were at issue, and reinstated the jury verdict on the grounds that "the state interest [in governing defamation] adequately supports awards of presumed and punitive damages...." Dun & Bradstreet, supra, 472 U.S. at 761, 105 S.Ct. at 2946, 86 L.Ed.2d at 604.
*496 While New Jersey courts have decided defamation claims on numerous occasions following Dun & Bradstreet, no reported decision has addressed the issue of applying the "pure opinion" approach of Gertz to defamation claims in private matters. Because the Dun & Bradstreet decision expressly limited the principles of Gertz to matters of public concern as respects the federal constitutional right of speech, and because the Kotlikoff opinion was based solely upon the application of the federal constitutional right to free speech, we believe that our Supreme Court, if it considered the issue, would find that the "pure" opinion standard of Gertz does not protect defendants in the present matter. See Erickson v. Marsh & McLennan Co., 117 N.J. 539, 562-66, 569 A.2d 793 (1990).
Although defendants' statements of fact and/or opinion may be considered defamatory in the absence of the Gertz protections and therefore actionable, we find that defendants' statements are protected by a qualified privilege. The qualified privilege, applicable in this case, has been best described as follows.
[A] communication "made bona fide upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty, is privileged if made to a person having a corresponding interest or duty, although it contains criminatory matter which, without this privilege, would be slanderous and actionable."
Bainhauer v. Manoukian, 215 N.J. Super. 9, 36, 520 A.2d 1154 (App.Div. 1987) (quoting Chief Justice Weintraub in Coleman v. Newark Morning Ledger Co., 29 N.J. 357, 375, 149 A.2d 193 (1959).
In Bainhauer, we noted that whether or not a statement was defamatory is "entirely irrelevant to the question of whether it was privileged." Id. 215 N.J. Super. at 39, 520 A.2d 1154. The "question of whether a defamatory statement is privileged is a determination which the judge rather than the jury must make." Id. at 40, 520 A.2d 1154. While it is necessary that the statements be bona fide in order to be non-actionable, we held that the question of whether the communication was made in *497 good faith goes to the determination of abuse of the privilege, which is usually a fact issue. Id.
In the present matter, we consider plaintiff's defamation claims with respect to three publications. The first publication was defendant Poe's memo to her supervisor, defendant Buckleman, the head of the Virginia office. The second publication was Buckleman's letter to Accorti, Royal's territorial vice president in Philadelphia, and the third publication was defendant Cary's letter to Lofberg which included a copy of the Buckleman letter. Each of these communications will be addressed in turn and analyzed under the qualified privilege rule.
Poe's memo to Buckleman was written at the request of Buckleman, her superior. In her memo, Poe described the events of July 14, 15 and 16 respecting plaintiff's behavior, much of which she found inappropriate. Although plaintiff disputes much of Poe's account, for purposes of analyzing the application of the privilege it does not matter whether or not Poe's account is in fact true. Fees v. Trow, 105 N.J. 330, 338, 521 A.2d 824 (1987). Poe's reason for writing the memo, however, is important, because in order to be considered privileged the communication must be made on a "subject-matter in which the party communicating has an interest, or in reference to which he has a duty." Bainhauer, supra, 215 N.J. Super. at 36, 520 A.2d 1154. In this case we conclude that Poe had both an interest in communicating her experiences with plaintiff and a duty to communicate those experiences. Poe certainly had an interest in her employment. Moreover, the degree to which she was uncomfortable working with plaintiff and did not want to work with him in the future was reasonably a part of that interest. Poe also had a duty to disclose her experiences to her supervisor, who, upon Poe's return to the office, expressly requested that Poe disclose how the training session went. Moreover, in the interest of the overall and ongoing relations between Royal and Lofberg, Inc., Poe had a duty to report actual or perceived problems in the relationship to her supervisor. *498 As Poe's superior, Buckleman had a clear interest in Poe's communication. See Erickson, supra, 117 N.J. at 562-565, 569 A.2d 793. Thus, the memo by Poe to Buckleman was qualifiedly privileged.
For the same reasons, we hold that the Buckleman letter to Accorti was protected. Buckleman's letter substantially recited the allegations of Poe's memo regarding plaintiff's behavior. It was communicated to Accorti, the territorial vice president of Royal, about a matter involving Poe, a Royal employee, and the employee of a Royalty Agent in the territory for which Accorti had responsibility on behalf of Royal.
Cary's letter to Richard Lofberg was also privileged substantially for the reasons that both the Poe and Buckleman communications were privileged. Cary was the Royal regional manager empowered with the authority to terminate the Royalty Agent status of Lofberg, Inc.. Both Royal and Lofberg, Inc. had an interest in the Royalty Agent agreement by which Lofberg, Inc. acted as an "underwriter" on Royal's behalf. Once the decision to terminate the Royalty Agent agreement had been made by Royal, Lofberg, Inc. had an interest in knowing why the agreement was terminated. Thus, all three communications by the individual defendants were protected by a qualified privilege.
The question of whether the communications were made in good faith does not affect the existence of the privilege but goes to the question of whether or not the privilege was abused. Bainhauer, supra, 215 N.J. Super. at 40-41, 520 A.2d 1154. The privilege will be lost if the communication was primarily motivated by a malicious intent. Fees, supra, 105 N.J. at 341, 521 A.2d 824. In Fees our Supreme Court, quoting from Coleman v. Newark Morning Ledger Co., supra, 29 N.J. at 375, 149 A.2d 193, stated the applicable principle as follows:
`[T]he court will look to the primary motive or purpose by which the defendant apparently is inspired'; it would seem that `the privilege is lost if the publication is not made primarily for the purpose of furthering the interest *499 which is entitled to protection'; if the defendant is moved `chiefly' by `motives of ill will, or to accomplish a distinct objective which may be legitimate in itself but is not within the privilege,' ... he is given no immunity.
Id. (quoting W. Prosser, Law of Torts, 601, 627-28 (2 ed. 1955). Thus, the existence of ill-will does not defeat the privilege unless it is the "primary motivating force." Id. at 342, 149 A.2d 193.
Plaintiff alleges that both Poe's memo and Cary's letter were motivated by malice. He claims that Cary had a "pre-existing animosity toward plaintiff" which "suggests ample motivation for her attacks on plaintiff's character". He also claims that "Poe's frustration and failure in leading her first agency training seminar suggests [sic] that the defamatory statements were motivated by a desire to find a scapegoat".
The general rule is that one's intent, or state of mind, is a factual question which should not be decided on summary judgment. Allen v. Planning Bd. Tp. of Evesham, 137 N.J. Super. 359, 364, 349 A.2d 99 (App.Div. 1975). While the question of whether a defamatory statement is privileged is a question for the judge to decide, the question of whether the privilege was abused is normally a jury question. Erickson, supra, 117 N.J. at 566, 569 A.2d 793. However, "[b]ecause a qualified privilege is favored with a presumption that there was no express malice, plaintiff carries the burden of establishing that the statements complained of were made `from an indirect or improper motive, and not for a reason which would otherwise render them privileged.'" Fees, supra, 105 N.J. at 342, 521 A.2d 824. Thus, the question is whether plaintiff has submitted evidence sufficient to overcome that burden. Id. at 342-343, 521 A.2d 824.
With respect to Cary, plaintiff claims that she "had a pre-existing animosity" toward him upon which a presumption as to Cary's maliciousness can be founded. Plaintiff implies that because Cary had previously spoken to plaintiff about his "drinking problem," she manifested a dislike of alcohol and *500 persons who consume alcohol, which served as the basis of her malicious letter to Richard Lofberg wherein she terminated the Royalty Agent agreement. We believe plaintiff's allegations are not supportable for several reasons.
It is uncontroverted that Cary discussed the matter with Accorti prior to deciding that she should terminate the Royalty Agent agreement with Lofberg, Inc.. This tends to show, in our opinion, that Cary was motivated by what was in Royal's best interest. Moreover, as defendants note, absent some showing to the contrary, Cary was entitled to rely upon Poe's statements as being truthful inasmuch as "[i]t would be quite unreasonable to say that an employer should disbelieve the statements of an agent upon whose truthfulness he should be entitled to rely." Jorgensen v. Pennsylvania R.R. Co., 25 N.J. 541, 567, 138 A.2d 24 (1958). Moreover, Cary's letter did not request that plaintiff be fired or condition Lofberg, Inc.'s continued relationship with Royal on plaintiff's termination.
Cary admitted that she had previously told plaintiff that, if he did not go to Alcoholics Anonymous, she would terminate his personal-line underwriting authority. After plaintiff told Cary he had joined Alcoholics Anonymous, she continued to believe that he was active in that organization and that he continued to abstain from drinking. Thus, Cary had no reason to be angry with plaintiff about his drinking.
Lastly, we find totally without foundation plaintiff's other accusations as to Cary's animosity toward him based on his previous complaints about computer problems with the Lofberg, Inc. hook-up to the Royal computer, and for Lofberg, Inc.'s failure to meet production goals in connection with the Royalty Agent agreement. Nowhere in the record did Cary deny the existence of computer problems or assert that those problems were not Royal's fault. As to the failure of Lofberg, Inc. to meet its production quotas, that failure, in and of itself, could have been properly used by Cary to terminate the Royal Agent agreement; there is no reason why she needed to make *501 plaintiff a scapegoat for terminating the agency agreement if Lofberg, Inc. in fact was not meeting its quotas.
Thus, we conclude there is insufficient evidence upon which a jury could determine that Cary abused the privilege. Even if Cary was motivated to some extent by ill will, there has been absolutely no showing that such ill will was the "primary motivating force" behind her communication as required by Fees, supra, 105 N.J. at 342, 521 A.2d 824. Nor can it be said, that plaintiff's certification sufficiently overcomes the presumption that there was no express malice. Id. As the Fees Court said:
The best that can be made of plaintiff's certification is that it rises to the level of a mere scintilla of evidence; and we continue to honor the proposition that `where the case is ... one of qualified privilege, and there is ... not more than a scintilla of evidence[] of malice, it is the duty of the trial judge to withdraw that issue from consideration of the jury.'
Id. at 344, 521 A.2d 824 (quoting Jorgensen v. Pennsylvania R.R. Co., supra, 25 N.J. at 569, 138 A.2d 24).
There is no evidence, much less a mere scintilla of evidence, establishing malice as to Buckleman. Buckleman appears to have been acting solely out of concern for the best interests of Royal. As we stated in Sokolay v. Edlin, 65 N.J. Super. 112, 128, 167 A.2d 211 (App.Div. 1961), "[i]t does not appear that the motive in making the alleged defamatory statement was other than to protect the interests of the defendants and those of the other employees."
Our analysis of the good faith basis for Poe's four page statement, however, compels a different result. As we pointed out in Bainhauer, "the privilege is lost if the speaker either knows the matter is false or acts in reckless disregard of its falsity." Id. 215 N.J. Super. at 42, 520 A.2d 1154. Ill will or bad faith "is demonstrated where one prepares false and fabricated reports knowing that they are such." Jerolamon v. Fairleigh Dickinson University, 199 N.J. Super. 179, 185, 488 A.2d 1064 (App.Div. 1985). Plaintiff disputes the truth and accuracy of the defamatory statements made by Poe who, *502 unlike Cary and Buckleman, spoke from first-hand knowledge of plaintiff's conduct and statements.
Marie Lendino's deposition is, arguably, supportive of plaintiff's position. She did not recall plaintiff telling Poe to shut up, or say anything disparaging about Royal. Nor did she recall Poe complaining about plaintiff or appearing upset. Concerning the luncheon with Poe and plaintiff, Lendino remembered that there was "a lot of kidding" and that Poe and Lendino were "teasing" plaintiff about his fiftieth birthday. While she also recalled plaintiff saying that "during sex women have it easy, all they have to do is lay on their backs and enjoy themselves", or "something to that effect" it was said in the context of their "joking around" and "in a joking manner." The following question and answer best sums up her testimony on the subject of plaintiff's affront to Poe's sensibilities:
Q. Was anything said, to your recollection, by Mr. Lutz which you thought may have offended Miss Poe?
(colloquy among counsel excluded)
A. I don't remember, because, like I say, there was a lot of kidding around. What she would take offense at, I don't know.
Regardless of our view of the evidence on this point, we cannot say as a matter of law that Poe's report was an accurate portrayal of what occurred. The question of her credibility in this case goes to the heart of the good faith issue. Such decisions are appropriately left to a jury to decide. Erickson, supra, 117 N.J. at 566, 569 A.2d 793; Jerolamon, supra, 199 N.J. Super. at 185, 488 A.2d 1064; Bainhauer, supra, 215 N.J. Super. at 44, 520 A.2d 1154. Because Poe was acting as an agent of Royal at this time, Royal will be liable to plaintiff if Poe is liable. Thus, the summary judgment entered in favor of Poe and Royal is reversed.

II
Plaintiff argues that he presented sufficient evidence to the trial court in order to create a jury question on whether defendants interfered with his contractual and economic advantage. *503 Plaintiff claims he was terminated as a result of Cary's letter to Richard Lofberg, and that defendants' communications were intended to result in his termination. He argues that her message to the Lofbergs "was clear: fire plaintiff or your Royalty Agent status will not be returned."
Plaintiff agrees that, in order to succeed in his claim that defendants interfered with his contractual relations and his prospective contractual relations, he must establish actual interference, and that the actual interference was maliciously intended. Sokolay, supra, 65 N.J. Super. at 128, 167 A.2d 211. The "term malice is not used in the literal sense requiring ill will toward the plaintiff.... Rather, malice is defined to mean that the harm was inflicted intentionally and without justification or excuse." Printing Mart v. Sharp Electronics, 116 N.J. 739, 751, 563 A.2d 31 (1989) (quoting in part Restatement (Second) of Torts, Chapter 37 at 5 (introductory note) (1979)).
However, as we see it, the plaintiff here, as in Bainhauer, is attempting to prove his malicious interference claims with precisely the same evidence that forms the basis for his defamation claim. We adhere to the observation we made in Bainhauer on the subject.
Proof or failure of proof of the operative facts of the defamation count would, therefore, completely comprehend the malicious interference cause. Thus, if no abuse of privilege is found, then the "malicious" predicate of the interference count would also fail. If abuse of privilege is found, the malicious interference cause would add nothing to plaintiff's available remedies for defamation and would, therefore, be entirely duplicative of the defamation count.
Bainhauer, supra, 215 N.J. Super. at 48, 520 A.2d 1154. Thus, we conclude that the malicious interference claims were properly dismissed as duplicative of plaintiff's sole remaining defamation claim.
Affirmed in all respects as to defendants Buckleman and Cary. Reversed and remanded as to defendant Poe and Royal Insurance Company, her employer.
NOTES
[1] The claims against the Lofberg defendants have been settled.
[2] We assume for the purpose of discussion only that the trial judge was correct in his analysis that pure opinion was involved here. The correctness of that conclusion is not important to our analysis.
[3] As to the developing treatment of the fact/opinion dichotomy in matters of public concern after Gertz, see Milkovich v. Lorain Journal Co., et al., 497 U.S. ___, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990).